IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION


- - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                                              :
         Plaintiff,              :
                                              :
vs.                                   :        Case No. 3:20-cr-00093
                                              :
JUSTIN TREANTON,              :      <u>SUPPRESSION HEARING TRANSCRIPT</u>
                                              :
         Defendant.            :
- - - - - - - - - - - - X



                                   Courtroom, First Floor
                                   U.S. Courthouse
                                   131 East Fourth Street
                                   Davenport, Iowa
                                   Friday, June 4, 2021
                                   3:17 p.m.


BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Judge.


APPEARANCES:

For the Plaintiff:          ANDREA L. GLASGOW, ESQ.
                                   United States Attorney's Office
                                   131 East Fourth Street, Suite 310
                                   Davenport, Iowa  52801


For the Defendant:          MURRAY W. BELL, ESQ.
                                   125 Kirkwood Boulevard
                                   Davenport, Iowa  52803




                       KELLI M. MULCAHY, CSR, RDR, CRR
                            United States Courthouse
                      123 East Walnut Street, Room 115
                            Des Moines, Iowa 50309

2

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

For the Government:

| | | | | |
|---------|--------|-------|----------|---------|
| Chris Carter | 6 | 19 | 29 | 30 |
| | | | | 31 |
| Kevin Hopkins | 33 | 42 | | |
| Michael McVey | 52 | 70 | | |
| Stephen Allen | 82 | 90 | 96 | |

E X H I B I T S

| GOVERNMENT'S EXHIBITS | OFFERED | RECEIVED |
|-----------------------|---------|----------|
| 1 - Recording of interview | 62 | 62 |
| 2 - Map | 8 | 8 |
| 2a - Photograph | 12 | 12 |
| 3 - Search warrant | 54 | 54 |
| 4 - Search consent form | 68 | 68 |
| 5 - Search warrant | 68 | 68 |
| 6 - Photograph | 18 | 18 |
| 7 - Criminal history and driver's license information | 70 | 70 |
| 8 - Stipulation | 5 | 5 |
| 9 - Acknowledgment | 5 | 5 |

1            P R O C E E D I N G S

2            (In open court, with the defendant present.)

3            THE COURT:  Thank you.  You can be seated.

4            We are here in the matter of United States vs.

5    Justin -- is it Treanton?

6            THE DEFENDANT:  Treanton.

7            THE COURT:  Treanton?  Okay.  It's easier than that.

8            It's Case 3:20-cr-93.  The defendant is personally

9    present and represented by his attorney, Murray Bell.  The U.S.

10   Attorney's Office is represented by Andrea Glasgow, and she is

11   joined by Scott County Deputy Chris Carter.

12           We are here for purposes of resolving the defendant's

13   motion to suppress his custodial un-Mirandized statements and

14   all evidence found as a result of and based upon those

15   statements filed at Docket 33 on April 1st of 2021.  The

16   Government has filed a timely resistance to that petition.

17           Ms. Glasgow, do you have any objection to us sealing

18   your response just because it identifies as one of the victims

19   of the child production -- or child pornography production the

20   defendant's daughter?

21           MS. GLASGOW:  No objection, Your Honor.

22           THE COURT:  Okay.  We're going to go ahead and seal,

23   then, Docket 34.

24           In advance of the hearing, the Government did provide

25   to me a series of exhibits, including the hour and 45 minute

1  audio tape of the interview that was conducted with Mr. Treanton

2  by law enforcement officers and a series of remaining exhibits,

3  including 2, 2A, 3 -- I don't remember how high they go -- 4, 5,

4  6, 7, 8, and 9.  I have reviewed all of those matters prior to

5  the hearing.

6          Was the stipulation ever signed?

7          MS. GLASGOW:  Yes, Your Honor.

8          THE COURT:  Okay.  So I just don't have a signed

9  version of that, but otherwise I have reviewed everything in

10  anticipation of the hearing.

11          As I understand it, the real fighting issue in this

12  case is whether or not the manner in which the defendant was

13  initially encountered by Homeland Security officers and taken

14  into custody initially impacts the manner in which his later

15  statements should be viewed.

16          I don't think there's any dispute here that during the

17  hour and 45 minutes or so that he was being questioned by

18  officers that he was not provided with a Miranda warning.  I

19  don't think there's any dispute that he was told that he was

20  free to go, that he was told he didn't have to answer any

21  questions if he didn't want to, and that he was told those

22  things on multiple occasions.

23          I think, as I understand it, the issue just becomes did

24  whatever happened with his initial detention color everything

25  else to such an extent that his later statements should be

1    suppressed.

2            Is that a fair summary?

3            MS. GLASGOW:  Yes, Your Honor.

4            MR. BELL:  I believe that's a fair summary.

5            THE COURT:  Okay.  Would the Government like to present

6    evidence?

7            MS. GLASGOW:  Yes, Your Honor.

8            THE COURT:  Go ahead.

9            MS. GLASGOW:  Your Honor, at this time I would just

10   offer 8 and 9, which is the stipulation and the acknowledgment.

11           Do you wish to view the signed stipulation or do you

12   just want me to file it?

13           THE COURT:  No.  As long as it hasn't changed since it

14   was provided to me, then it can just be filed.

15           So Government Exhibits 8 and 9, any objection,

16   Mr. Bell?

17           MR. BELL:  I don't have copies of them, but I --

18           Okay.  No objection, Your Honor.

19           THE COURT:  Government's Exhibits 8 and 9 are admitted.

20                   (Government Exhibit Nos. 8 and 9 were

21                    offered and received in evidence.)

22           MS. GLASGOW:  The Government calls Christopher Carter

23   to the stand.

24           CHRIS CARTER, GOVERNMENT'S WITNESS, SWORN

25           THE DEPUTY CLERK:  Thank you.  Please have a seat.

1          THE COURT:  And you can begin whenever you're ready,

2    Ms. Glasgow.

3                     DIRECT EXAMINATION

4    BY MS. GLASGOW:

5    Q.  Would you please state and spell your name for the record.

6    A.  Chris Carter, C-a-r-t-e-r.

7    Q.  What is your current occupation?

8    A.  I'm employed by the Scott County Sheriff's Deputy -- or

9    Sheriff's Office.

10   Q.  How long have you been with the Scott County Sheriff's

11   Office?

12   A.  Eleven years.

13   Q.  Do you have any current specific assignment within the

14   sheriff's office?

15   A.  I'm currently assigned to the Drug Enforcement

16   Administration as a federal task force officer.

17   Q.  How long have you been a federal task force officer?

18   A.  Just under a year with DEA, and prior to that I was with

19   FBI.

20   Q.  How long were you with the FBI?

21   A.  Approximately four years.

22   Q.  And with both of those assignments, they've kind of been

23   cross-designations where you've remained with the sheriff's

24   office as well?

25   A.  Correct.

1  Q.  I want to turn your attention to January 30th of 2020.  Were

2  you asked to assist other agencies in locating a Justin Treanton

3  in Bettendorf, Iowa?

4  A.  I was.

5  Q.  Do you know why you specifically were asked to assist?

6  A.  It's my understanding it was all hands on deck due to the

7  nature of the alleged offense.

8  Q.  And what information did you have when you were going to be

9  assisting?

10  A.  That a prior search warrant was executed on a residence but

11  there was still an outstanding search warrant for the person of

12  Mr. Treanton.  I believe we received information that he was

13  possibly in a garage, unbeknownst to the owner.

14  Q.  Were you familiar with Mr. Treanton before January 30th,

15  2020?

16  A.  I was not.

17  Q.  Did you receive any information about him?

18  A.  I received photographs via email and was informed that he

19  had prior alerts for actively resisting and assaults.

20  Q.  And then did you, in fact, go and assist with locating

21  Mr. Treanton?

22  A.  I did.

23  Q.  And was part of that a response to 2917 Belleview Avenue in

24  Bettendorf, Iowa?

25  A.  It was.

1  Q.  And is that an area that you're generally familiar with?

2  A.  Yes.

3  Q.  On that date, what sort of uniform or clothing were you

4  wearing?

5  A.  I operate out of plain clothes, and then I just have an

6  outer vest carrier that identifies "Sheriff's Office" on it.

7  Q.  I'm going to show you what's been marked as Government's

8  Exhibit 2.

9         MS. GLASGOW:  May I approach, Your Honor?

10         THE COURT:  You may.

11  BY MS. GLASGOW:

12  Q.  Do you recognize Government's Exhibit 2?

13  A.  I do.

14  Q.  Is that generally the area of 2917 Belleview Avenue in

15  Bettendorf?

16  A.  It is.

17         MS. GLASGOW:  Your Honor, at this time I'd offer

18  Government's Exhibit 2.

19         MR. BELL:  No objection, Your Honor.

20         THE COURT:  Government Exhibit 2 is admitted.

21               (Government Exhibit No. 2 was

22                offered and received in evidence.)

23         MS. GLASGOW:  May I publish, Your Honor?

24         THE COURT:  Yes.

25

1  BY MS. GLASGOW:

2  Q.  Detective Carter, on Government's Exhibit 2, we see what's

3  been kind of pinpointed by the map's application as 2917

4  Belleview Avenue.  Just below the "Bettendorf, IA," we see a

5  rectangle that's gray.  Do you see that?

6  A.  I do.

7  Q.  Can you describe what that item is?

8  A.  It's a detached garage.

9  Q.  And is that the location that you were responding to?

10  A.  I was.

11          MR. BELL:  Your Honor, could I -- Ms. Glasgow, the

12  hearing device is a line of sight device that's right above

13  Detective Carter's head, so when you move back and forth, it

14  cuts in and out.

15          MS. GLASGOW:  I apologize.

16          THE COURT:  Would it be better if she questioned from

17  counsel table?

18          MR. BELL:  She can be there as long as she doesn't --

19          THE COURT:  Okay.  Thank you.

20  BY MS. GLASGOW:

21  Q.  I'm sorry.  Officer Carter, what is that gray rectangle

22  we're seeing there?

23  A.  A detached garage.

24  Q.  And is that the detached garage that you were responding to

25  to locate Mr. Treanton?

1  A.  It is.

2  Q.  We see then two streets, Belleview Avenue, Central Avenue,

3  and then there's a parallel brown or gray line through the

4  middle of the photograph.  Is that a street or an alley or what

5  is that line there?

6  A.  It's an alley that provides access to the overhead garage

7  door.

8  Q.  When you arrived in the area, were you the first on scene or

9  were there other officers already there?

10  A.  There was other officers.  I believe we all arrived

11  together.

12  Q.  And who else was responding, if you recall?

13  A.  Detective Weipert from the Scott County Sheriff's Office,

14  and then two other investigators, I believe, from Homeland

15  Security, and then Detective Hopkins from Bettendorf Police

16  Department.

17  Q.  And when you get actually to the location where the detached

18  garage is, what do you do personally?

19  A.  Me and Detective Hopkins took a position on the south side

20  covering the overhead door.

21  Q.  And is that the side that faces that alley there?

22  A.  It is.

23  Q.  And where did the other agents go, to your knowledge?

24  A.  They went to the man door that was opposite the side of the

25  garage.

1  Q.  Once everyone is surrounding the garage, what happens?

2  A.  Detective Weipert began to attempt to make contact with

3  anybody inside the garage while we still remained in our

4  position at the overhead door.

5  Q.  Could you hear Detective Weipert in your location?

6  A.  I could.

7  Q.  At some point, then, do you open the overhead garage door?

8  A.  I do.

9  Q.  And what prompted that?

10 A.  We could smell fresh burning, like someone just lit a

11 cigarette, on the -- directly on the other side of the garage

12 door.

13          THE COURT:  Can you spell Weipert?

14          MS. GLASGOW:  W-e-i-p-e-r-t.

15          THE COURT:  Okay.  Thank you.

16 BY MS. GLASGOW:

17 Q.  At the point that you smelled the cigarette smoke, based on

18 what you were hearing, did you believe that Detective Weipert

19 and the other agent --

20          MR. BELL:  Objection; leading the witness.

21          THE COURT:  Overruled.

22          Go ahead.  Go ahead.

23 BY MS. GLASGOW:

24 Q.  At the time that you smelled the cigarette smoke, based on

25 what you were hearing, did you believe that the other officers

1  had yet made contact with anyone in the garage?

2  A.  They had not, to my knowledge.

3  Q.  So then you opened the overhead garage door.  Was it

4  mechanical or you just pulled up on it?

5  A.  I was able to just lift up on it and open it manually.

6  Q.  And what do you see when you open the garage door?

7  A.  There was a large amount of stuff in the garage, but I

8  immediately observed Mr. Treanton traveling at the opposite

9  direction of me and disobeying our commands.

10 Q.  I'll show you what's been marked as Government's 2a.  Do you

11 recognize that photograph?

12 A.  I do.

13 Q.  Does that fairly depict generally the nature of the garage

14 when you observed it?

15 A.  It does.

16         MS. GLASGOW:  At this time I'd offer 2a.

17         MR. BELL:  No objection.

18         THE COURT:  Government Exhibit 2a is admitted.

19                 (Government Exhibit No. 2a was

20                  offered and received in evidence.)

21 BY MS. GLASGOW:

22 Q.  Detective Carter, we're seeing quite a bit of debris there,

23 some of which is clearly in the way of the garage door and into

24 the driveway or alleyway there.  Is it fair to say that some of

25 that was not in that location at the time the door opened, it

 1  kind of fell out as things are going on?

 2  A.   Correct.

 3  Q.   So can you please describe to us where it is that you

 4  observe Mr. Treanton?

 5  A.   He was in the -- it would be the upper left-hand side of the

 6  picture, where that large -- I believe it's a box or dresser of

 7  some sort.

 8  Q.   And was he behind debris or on top of debris?  Where was he

 9  located?

10  A.   He was on top attempting to travel towards the back of the

11  garage, away from the door.

12  Q.   And are you giving Mr. Treanton any commands at that point?

13  A.   We were.

14  Q.   What were you telling him?

15  A.   We were advising him to stop, acknowledge -- announcing

16  ourselves as law enforcement.

17  Q.   At some point, then, is Mr. Treanton coming back towards you

18  at all?

19  A.   No.

20  Q.   Does he appear to be making any progress towards the man

21  door?

22  A.   No.

23  Q.   What occurs then?

24  A.   He was wearing like bib overalls, like Carhartt overalls.  I

25  was able to reach up over top of the debris, grab him by the

1  suspender portion of the overalls, and pull him down towards us,

2  and brought him to the ground.

3  Q.  And when you pull him down, do things kind of fall and he

4  goes to the ground?

5  A.  Correct.  Yes.

6  Q.  And you can kind of see here, but in 2a, there's white stuff

7  by the garage.  What were the weather conditions on that day?

8  A.  It was all just a solid sheet of ice there.

9  Q.  And once Mr. Treanton is then to the ground, what happens?

10 A.  He had a large flashlight that was in his hand when I

11 grabbed him initially, and then I placed him on the ground, and

12 he tucked both of his hands under his body, actively resisting,

13 I mean, Detective Hopkins.

14 Q.  And were you giving Mr. Treanton any commands then?

15 A.  We were.

16 Q.  What commands were you giving?

17 A.  We were advising him to stop resisting.

18 Q.  Were you able to obtain Mr. Treanton's hands?

19 A.  Eventually, I did.

20 Q.  Were you initially able to obtain his hands?

21 A.  No.

22 Q.  At that time, to your knowledge, did he still have

23 possession of this flashlight?

24 A.  I -- he had the flashlight, as well as I didn't know what he

25 had in his waistline.

1  Q.  And can you describe your observations of that flashlight?

2  A.  I believe it was a larger like green -- like what I would

3  describe like a Mag, like metal Maglite, approximately probably

4  like nine inches long.

5  Q.  And when did you first observe that item?

6  A.  He had it in his hand when he was traveling away from us.

7  Q.  And what was he doing with it before you got him out of

8  garage?

9  A.  He had it -- he had it raised up.  I believe it was his left

10 hand, but I think naturally when I grabbed him, I think his left

11 hand naturally came up when he was falling towards the ground.

12 Q.  So he's not initially giving up his hands.  What happens?

13 A.  We gave him several commands to stop resisting.  He

14 continued to keep his hands tucked underneath.  At that point in

15 time, I didn't know what he was reaching for, and I didn't have

16 a Taser or any other tool, so I struck him one time in his

17 facial region with my right hand, and at that point we gained

18 his compliance and got his hands.

19 Q.  Did you strike him with any other objects?

20 A.  No.

21 Q.  Did you strike him with any other parts of your body?

22 A.  No.

23 Q.  Did you strike him with your hand any more than one time?

24 A.  No.

25 Q.  Once you had his hands, was he then placed in handcuffs?

1   A.   He was.

2   Q.   Did you place him in handcuffs?

3   A.   I did not.

4   Q.   But other officers did at that point?

5   A.   Correct.

6   Q.   Did you make any statements to Mr. Treanton at that time

7   about him being under arrest or any other custodial statements?

8   A.   No.

9   Q.   Did you hear anyone else tell him he was under arrest at

10  that time?

11  A.   No.  Not that I recall.

12  Q.   Did you have any involvement in the investigation of

13  Mr. Treanton?

14  A.   No.

15  Q.   Did you have any knowledge of whether or not he was going to

16  be placed under arrest that day?

17  A.   No.

18  Q.   At the point, then, that you were able to gain compliance,

19  did you do a pat-down and search for weapons on Mr. Treanton's

20  person?

21  A.   I did.

22  Q.   And was that you personally?

23  A.   Yes.

24  Q.   And did you locate anything?

25  A.   In his right pants pocket or coveralls pocket was a pair of

1  child's underwear, which he stated was his daughter's.

2  Q.  And did you ask a question or did he just state it was his

3  daughter's?

4  A.  He just stated it when I was trying to figure out what

5  the -- what it was in his pocket.

6  Q.  Did you hear Mr. Treanton make any statements about a cell

7  phone?

8  A.  Not that I recall.

9  Q.  Once Mr. Treanton is handcuffed, is he seated in a position

10  that you were able to observe his face?

11  A.  Yeah.

12  Q.  Did you observe any injuries to his face?

13  A.  Yeah.  He had a slight cut, I believe, on his nose.

14  Q.  Any other injuries that you observed?

15  A.  No.

16  Q.  Was Mr. Treanton offered medical attention?

17  A.  He was.

18  Q.  And did he want medical attention?

19  A.  He did not.

20  Q.  Are you sure -- are you aware of how Mr. Treanton obtained

21  that slight cut to his nose?

22  A.  No.  I don't know if it was from when I initially placed him

23  on the ground on the ice or if it was from the strike that I

24  delivered.

25  Q.  I'm going to show you what's been marked as Government's

1    Exhibit 6.  Do you recognize the individual depicted in

2    Government's Exhibit 6?

3    A.  I do.

4    Q.  Does that fairly and accurately represent Mr. Treanton as

5    you observed him on June -- January 30th of 2020?

6    A.  Yes.

7    Q.  Fair to say at the point that you observed him, there was a

8    bit more blood then that's been wiped away in that picture, but

9    that's consistent with the injuries you observed?

10   A.  Yes.

11           MS. GLASGOW:  At this time I'd offer Government's

12   Exhibit 6.

13           MR. BELL:  No objection.

14           THE COURT:  Government's Exhibit 6 is received.

15                   (Government Exhibit No. 6 was

16                    offered and received in evidence.)

17   BY MS. GLASGOW:

18   Q.  Did you have any further involvement with Mr. Treanton?

19   A.  No.

20   Q.  Did you have any part in moving him to a vehicle or moving

21   him anywhere else?

22   A.  No.

23           MS. GLASGOW:  I don't have any further questions for

24   this witness, Your Honor.

25           THE COURT:  Mr. Bell.

1                         CROSS-EXAMINATION

2    BY MR. BELL:

3    Q.  Detective Carter, as you probably know, I'm Murray Bell, and

4    I'll have some questions for you.

5            Where were you before you were in the sheriff's office?

6    I think you said you've been in the sheriff's office ten years.

7    What did you do before that?  Or 11 years.

8    A.  I got hired when I was 21.

9    Q.  Okay.  Now, as a part of the information you had when you

10   were looking for him was that there were allegedly videos of him

11   having his 4-year-old daughter commit a sex act on him; is that

12   correct?

13   A.  I don't -- I'm not even sure I was aware of that, Mr. Bell.

14   I was just strictly --

15   Q.  But you could have been aware of it?  I mean, they told you

16   why they were looking for him, right?

17   A.  That there was a search warrant regarding a child abuse or

18   sexual abuse case, correct.

19   Q.  Okay.  Well, if it's a sexual abuse case, it's a fair chance

20   you're going to arrest somebody, right?

21   A.  I had no case knowledge, no.

22   Q.  Okay.  And you can also arrest somebody for resisting

23   arrest, can't you?

24   A.  Certainly.

25   Q.  And for not cooperating?

1  A.  Certainly.

2  Q.  Okay.  And your view was that he was not cooperating?

3  A.  He was actively resisting.

4  Q.  Okay.  And that, in and of itself, is a reason to arrest

5  him?

6  A.  You can.

7  Q.  Okay.  All right.  Now, you told us that you were at the

8  overhead door.  I call it the bay door, but you know what I'm

9  talking about?

10  A.  Sure.  Yeah.

11  Q.  And there was someone at the personnel door, correct?

12  A.  Correct.

13  Q.  One officer or two; do you recall?

14  A.  Three, I believe.

15  Q.  Okay.  Do you know if they had opened their door and were

16  looking inside before you opened the garage -- the overhead

17  door?

18  A.  I know they were giving commands, but I don't know if the

19  door was open or not.

20  Q.  Okay.  So you knew that they gave commands to Mr. Treanton,

21  correct?

22  A.  Correct.

23  Q.  Did you hear what those commands were?

24  A.  I -- I did at the time, but I didn't document them.

25  Q.  And could one of those commands have been, "Come over here

1    to us"?

2    A.   Yeah.

3    Q.   Okay.  So he could have been told to go to the other door

4    before you opened the garage door, correct?

5    A.   Correct.  But there was a time lapse.

6    Q.   Okay.  But there was a lot of stuff to climb over in the

7    garage, wasn't there?

8    A.   There was.

9    Q.   Okay.  I mean, it was a mess, right?

10   A.   Correct.

11   Q.   So you open the garage door, and you see him going away?

12   A.   Correct.

13   Q.   But you just grab him and throw him down on the ground,

14   correct?

15   A.   After I gave him commands.

16   Q.   That's interesting.  Do you think you wrote in your report

17   that you gave commands?

18   A.   I don't have it in front of me.

19   Q.   Okay.  Do you think you wrote in your report that you gave

20   commands?

21   A.   If you have it, I'm more than happy to take a look at it.

22   Q.   I have it on my computer.  It's too much work.  Well,

23   maybe -- okay.

24          But eventually, you grabbed him.  Whatever took place

25   before you grabbed him, you eventually grabbed his -- what did

 1 | you say, his left hand, left arm?

 2 | A.  No.  I grabbed his, like, suspender straps on the Carhartt

 3 | portion of his coveralls.

 4 | Q.  And you pulled him forward?

 5 | A.  Pulled him backwards because he was facing away from me.

 6 | Q.  But you tried to turn him around also, right?

 7 | A.  He was actively trying to climb over the stuff away from me

 8 | when I grabbed him, so I grabbed the back of his Carhartts and

 9 | pulled him, pulled him back, and --

10 | Q.  And then, as I understand it, you helped him to the ground?

11 | A.  Correct.  I mean, he was falling -- yeah.  He was pulled off

12 | the mountain of debris.

13 | Q.  And you actually slammed him to the ground, didn't you?

14 | A.  No, I did not, actually.

15 | Q.  If you're pushing him down or helping him, as you called it,

16 | to the ground, it's a natural response to get your hands in

17 | front of you, isn't it?

18 | A.  It is.  It wasn't even -- I wasn't helping him to the

19 | ground.  It was we were falling off the -- off the debris.

20 | Q.  So you were -- were you falling on top of him?

21 | A.  I don't think I fell on top of him.  I mean, I ended up on

22 | top of him in an attempt to place him in handcuffs.

23 | Q.  Okay.  But you say he was actively walking away from you?

24 | A.  Crawling, yeah.

25 | Q.  Well, climbing over the stuff?

1  A.  Correct.

2  Q.  Couldn't walk, really?

3  A.  Correct.

4  Q.  Okay.  But, again, you don't know if he was responding to

5  somebody else's command, correct?  If somebody commanded him,

6  "Come to us," he could have been responding to somebody else's

7  command?

8  A.  I would say he was not due to the time -- the time

9  difference in when those commands were given, and then there was

10 no cigarette smoke, and then all the sudden after the commands

11 were being given, he -- it was evident that he just lit a

12 cigarette in the garage that we could then smell as if he was

13 not intending to come out.

14 Q.  Where is the cigarette?

15 A.  It -- I don't know where it was at in the garage.  I'm not

16 sure.

17 Q.  You didn't find -- you let a burning cigarette lay in all of

18 that debris?

19 A.  There could have been an ashtray up there.  I'm not certain.

20 There was food.  I mean, he had a little nest there that

21 appeared he was staying there.

22 Q.  So I guess I'm confused.  I thought you said you grabbed his

23 arm, but now you're saying you grabbed his --

24 A.  I don't believe I ever stated I grabbed his arm.  I

25 grabbed -- I grabbed his arm once we were on the ground in an

1  attempt to pull it out from underneath him.

2  Q.  And you told us that he had a flashlight in his left hand?

3  A.  I believe it was his left hand.

4  Q.  And you perceived that he was -- had the left hand up as a

5  counterbalance to maybe your pulling him down?  You said it was

6  a natural response or something.

7  A.  Yeah.  I think he -- when he was pulled back, I think when

8  he was falling back, his left arm naturally came up, and he had

9  the flashlight in his left hand.

10 Q.  Yeah.  You didn't perceive he was trying to hit you with it?

11 A.  Not at that time.  I wasn't -- I wasn't -- I felt confident

12 I wasn't going to get struck with it at that point in time just

13 due to his balance -- lack of balance on the debris.

14 Q.  Okay.  Now, you indicated he was -- "placed" on the ground

15 was the word you used, right, he was placed on the ground?  He

16 was forced to the ground, wasn't he?

17 A.  Yeah.  He -- he didn't have an option.  I mean, he went to

18 the ground.

19 Q.  And you were helping him get to the ground?

20 A.  I -- again, I think it was more he was on debris.  My

21 intention was to get him on the ground, yes.

22 Q.  Yes.

23 A.  But it didn't take much force due to the situation.

24 Q.  You admit that you struck him in the face at least one time,

25 correct?

1  A.  Just one time.

2  Q.  No more than that?

3  A.  No.

4  Q.  Okay.  Let me ask you a question:  Do you recall how many

5  different law enforcement agencies were present at the

6  ground -- at the garage?  Excuse me.

7  A.  I believe three.

8  Q.  Well, let's see.  We have Bettendorf Police, Scott County

9  Sheriff, Homeland Security, DCI with the Homeland Security guy,

10 wasn't there?

11 A.  If they're from separate agencies, then there would be four.

12 Q.  Okay.  And there were, I think you said, a total of five

13 people or four people present at the garage, men, officers?

14 A.  I believe there was five of us at that point in time, but

15 two when he was --

16 Q.  I don't think there's a question pending.

17 A.  I guess my question -- or I was trying to explain -- are you

18 talking on the property or at his person?

19 Q.  In the vicinity.

20 A.  Okay.

21 Q.  You know, I mean, when you have cops all over the place,

22 there's cops all over the place.  They don't all have to be

23 right on top of you, right?

24 A.  Sure.  Right.  Sure.

25 Q.  Okay.  And it's your testimony you never told him he was

1  under arrest, right?

2  A.   To my knowledge, he wasn't.

3  Q.   Well, you initially said you didn't have a reason to arrest

4  him, but, of course, he was not cooperative, which is a reason

5  to arrest him, right?

6  A.   I was called to locate him to execute a search warrant for

7  his person.

8  Q.   I'm pretty sure that wasn't an answer to the question I

9  asked.   He was resistive.   You're claiming he was resistive, he

10 wasn't following commands that you gave him?

11 A.   Correct.

12 Q.   He could have been following commands somebody else gave

13 him?

14 A.   I disagree.

15 Q.   Okay.   But you did say they did tell him to come toward

16 them, didn't they?

17 A.   They did.

18 Q.   Okay.   So wouldn't be unusual if he was following that

19 command, would it, when you get the door open?

20 A.   As I previously stated, Mr. Bell, due to the time difference

21 that I don't believe that he was following their commands.

22 Q.   Okay.   How much time elapsed between the time you opened the

23 garage door and you have him on the ground?

24 A.   Not much at all.   Maybe 20 seconds.

25 Q.   So it all happened pretty fast?

1   A.   Correct.

2   Q.   Didn't have a lot of time to judge what he was doing, did

3   you?

4   A.   I think 20 -- 20 seconds is more than sufficient to decide

5   whether he's coming and complying with my commands or not.

6            MR. BELL:  May I have a second with my client?

7            THE COURT:  Yes.

8            MR. BELL:  Thank you, Your Honor.

9   BY MR. BELL:

10  Q.   When you struck him in the face, how was he positioned on

11  the ground?

12  A.   He had both hands tucked under what I'll refer to as his

13  waist area, his waistline, and I believe his head was positioned

14  to the right as if he was looking at me.

15  Q.   And you punched him in the face?

16  A.   One time, correct.

17  Q.   Now, when you opened the garage door and you see him on this

18  pile of stuff -- you know, I think we've agreed that some of the

19  items -- can you see it on your monitor there, Deputy?

20  A.   I can.

21  Q.   Okay.  Thank you.

22           I think we've agreed that some of this stuff has been

23  moved from the pile and moved out.  The green blanket probably

24  was inside the garage and now it's not.  But that's an

25  interesting array of items.  In other words, he would have had

1  to almost be crawling up it to get over it; is that right?

2  A.  Correct.  He was.

3  Q.  Okay.  And how far up was he when you grabbed ahold of him

4  and he raised his hands?

5  A.  He was to the left of your --

6  Q.  I didn't mean to put that on there.

7  A.  Oh.

8  Q.  I'm sorry I touched it.  I forgot.

9          MR. BELL:  I wonder if we could have that erased, Your

10  Honor.

11          THE COURT:  Yep.  We'll clear it.

12          MR. BELL:  Kyle, would you?

13          Thank you.

14  BY MR. BELL:

15  Q.  Why don't you touch it, tell me where you think he was.

16  A.  (Witness complied.)

17  Q.  Okay.  And that is where his head was or his bottom was,

18  what?

19  A.  That's just the general vicinity that his body was.

20  Q.  Okay.  All right.  And he was crawling away with his -- away

21  from you with his back to you?

22  A.  Correct.

23          MR. BELL:  Okay.  Thank you, Your Honor.  I don't think

24  I have any other questions at this time for this witness.

25          THE COURT:  Ms. Glasgow.

 1          MS. GLASGOW:  Thank you, Your Honor.

 2                     REDIRECT EXAMINATION

 3   BY MS. GLASGOW:

 4   Q.  Detective Carter, just for purposes of the record, you've

 5   made a green circle.  Would you say it's accurate to describe

 6   that that's over the large brown box in the left quadrant of the

 7   garage?

 8   A.  Correct.

 9   Q.  At the time that you all are approaching the garage and

10   calling out for Mr. Treanton, did you know who was in the

11   garage?

12   A.  We did not.

13   Q.  Did you know whether Mr. Treanton was in the garage?

14   A.  We did not.

15   Q.  Did you know what was in the garage?

16   A.  All we knew was there was not supposed to be anybody in the

17   garage.

18   Q.  And in a situation like that, do you have concerns about

19   officer safety?

20   A.  I do.

21   Q.  And did that play a role in your decision to open up the

22   overhead garage door?

23   A.  It did.

24   Q.  Can you explain to us what your concerns were and why that

25   led to your opening the garage?

1  A.  Because it was -- the garage door is just a very thin piece

2  of metal.  I'm going to refer to it as metal, I guess.  But it

3  offers zero cover.  It only provides concealment.  So if he

4  chose to -- if somebody was on the other side of that with any

5  type of firearm, it would go right through that, putting us at

6  risk.

7           MS. GLASGOW:  I have no further questions, Your Honor.

8           THE COURT:  Mr. Bell?

9           MR. BELL:  Your Honor, I have up on my computer his

10  police report.  May I take the computer up there and let him

11  scroll through it?

12           THE COURT:  Yes, you may.

13           MS. GLASGOW:  Murray.

14           MR. BELL:  Oh, thank you.  That's easier.

15                       RECROSS-EXAMINATION

16  BY MR. BELL:

17  Q.  I believe this is the report, but if you just want to -- I

18  think this is Hopkins' report.  Go ahead and use your report.

19  You just look through it and see if you wrote in there that you

20  were giving commands.

21  A.  It is not documented in this report.

22  Q.  I think there's a second page.  Did you see the second page?

23  A.  I wrote it in chronological order here, so, no, it's not.

24  Q.  You did not write anything about giving him commands and he

25  didn't cooperate with you, correct?

1  A.  Correct.  It's not documented in the report.

2          MR. BELL:  May I approach to retrieve the item?

3          THE COURT:  Yes, sir.

4          MR. BELL:  Thank you.

5          I don't have any other questions.  Thank you, Your

6  Honor.

7          THE COURT:  Is the whole garage just floor to ceiling

8  full of stuff?

9          THE WITNESS:  It is.

10         THE COURT:  And I would describe this as like sort of a

11 hoarding situation.  This isn't organized.  This is just giant

12 piles of stuff?

13         THE WITNESS:  Correct.

14         MR. BELL:  Can I have a second with counsel?

15         THE COURT:  Yes.

16         MR. BELL:  May I proceed?

17         THE COURT:  Oh, yes.

18                  FURTHER RECROSS-EXAMINATION

19 BY MR. BELL:

20 Q.  Detective Carter, did you ever walk inside what you referred

21 to as the man door?  Did you ever go to that portion of the

22 garage?

23 A.  Not that I recall.

24 Q.  Okay.  All right.

25         MR. BELL:  I think that we can agree -- Ms. Glasgow and

1   I can agree that at the other side of the pile, that is on the

2   man door side, there was an area that was not a very big area,

3   but an area that was clear.

4          THE COURT:  Like how big of an area?

5          MR. BELL:  The officer who wrote about it didn't say

6   exactly, and I never got a look, and we don't have a picture

7   that I know of.

8          MS. GLASGOW:  The officers from the other side of the

9   door will be testifying, Your Honor.  We can verify with them.

10         THE COURT:  Okay.

11         MR. BELL:  Very good.

12         THE COURT:  Anything else for this witness?

13         MS. GLASGOW:  No, Your Honor.

14         THE COURT:  Thank you.  You can go back to counsel

15  table.

16                              (Witness excused.)

17         THE COURT:  Ms. Glasgow, you can call your next

18  witness.

19         MS. GLASGOW:  Government calls Detective Kevin Hopkins.

20         THE COURT:  He's going to swear you in.

21         KEVIN HOPKINS, GOVERNMENT'S WITNESS, SWORN

22         THE DEPUTY CLERK:  Thank you.  Please have a seat.

23         THE WITNESS:  Thanks.

24         THE COURT:  Go ahead, Ms. Glasgow.

25

1              DIRECT EXAMINATION

2  BY MS. GLASGOW:

3  Q.  Can you please state and spell your name for the record?

4  A.  Yeah.  My name is Kevin Hopkins, H-o-p-k-i-n-s.

5  Q.  What is your current occupation?

6  A.  I'm a detective with the Bettendorf Police Department.

7  Q.  How long have you been with the Bettendorf Police

8  Department?

9  A.  It will be 13 years in August.

10 Q.  What is your current --

11         MR. BELL:  Excuse me.  Can I get you to lean on the

12 other side?  You're between me and the witness.  This is a bad

13 location for the defense attorney.

14         THE COURT:  We have often lamented that the people who

15 designed this courtroom never have been in or used a courtroom.

16         Go ahead, Ms. Glasgow.

17         MR. BELL:  Thank you, Ms. Glasgow.  I appreciate that.

18 BY MS. GLASGOW:

19 Q.  Detective, I think you said you'd been with the Bettendorf

20 Police Department for 13 years; is that correct?

21 A.  It will be 13 years in August.

22 Q.  And is that your entire experience in law enforcement?

23 A.  I've been with the Bettendorf Police Department for -- yes,

24 that's my entire experience.

25 Q.  Throughout your career, have you had other kind of

1   designations with like, for example, the Quad City Metropolitan

2   Enforcement Group?

3   A.   Yes.

4   Q.   But you've always home-based with the Bettendorf Police

5   Department?

6   A.   Correct.

7   Q.   What is your current assignment with Bettendorf Police

8   Department?

9   A.   I serve as a detective in our special operations unit.

10  Q.   What is the special operations unit?

11  A.   We are a unit that supports the mission of the Bettendorf

12  Police Department focusing on drug and gun crimes and also

13  outstanding fugitives.

14  Q.   How long have you been assigned to that unit?

15  A.   Approximately two years.

16  Q.   I want to turn your attention back to January 30th, 2020.

17  Were you asked to assist with locating Justin Treanton in

18  Bettendorf on that date?

19  A.   Yes.

20  Q.   Was Mr. Treanton someone that you were familiar with prior

21  to January 30th of 2020?

22  A.   Yes.

23  Q.   Had you had prior contact with him in your capacity as an

24  officer?

25  A.   I had.

1  Q.  About how many times had you had prior dealings with him?

2  A.  Approximately two to three times.

3  Q.  On that date, were you wearing a uniform?

4  A.  I was plain clothes.

5  Q.  Were you wearing any sort of law enforcement markings when

6  you go to the location?

7  A.  Yes.  I threw a vest on that said "Police" on the front and

8  on the back.

9  Q.  What information did you have about the nature of why you

10  were looking for Mr. Treanton?

11  A.  The information that I had received is that members of

12  Homeland Security, the Iowa Department of Criminal

13  Investigations, and the Scott County Sheriff's Office were

14  searching for Mr. Treanton or looking for Mr. Treanton in

15  regards to a search warrant that had been obtained for his

16  person.

17  Q.  As part of that assistance, did you go to 2917 Belleview

18  Avenue?

19  A.  Yes.

20  Q.  Is that a location that you're familiar with in Bettendorf?

21  A.  Yes.

22  Q.  Is it fair to say that you were specifically looking for

23  Mr. Treanton in a detached garage?

24  A.  Yes.

25  Q.  When you get there, are other officers already there?

1  A.  We all arrived approximately at the same time.  I believe,

2  to the best of my knowledge, I was out back and arrived with

3  some other officers at that time.

4  Q.  Who do you recall being there for law enforcement?

5  A.  I recall Detective Chris Carter with the Scott County

6  Sheriff's Office.  I recall Detective Chad Weipert with the

7  Scott County Sheriff's Office, Steve Allen with Homeland

8  Security Investigations, and I don't know his first name, but I

9  believe his last name is McVey, with the Department of Criminal

10 Investigations.

11 Q.  And when you all are kind of in the area then, what happens?

12 A.  Detective Carter and I were assigned to stand by the roll-up

13 door on the south or, you know, alley-facing side of the garage.

14 The other members went to a man door which is on the west side

15 of the garage.

16 Q.  From where you were at by the overhead door, could you hear

17 the other officers making commands?

18 A.  Yes.

19 Q.  At some point was it decided that you were going to open the

20 rolling door on your side?

21 A.  Yes.

22 Q.  What led up to that decision?

23 A.  As we heard the commands being given by the agents or

24 officers on the west side, I detected the odor of a burning

25 cigarette, and I believed it was coming from inside the garage.

1  I made a comment to Detective Carter, and about the same time he

2  made a comment to me in regards to the odor of that cigarette

3  coming from the garage, at which point we opened the garage

4  door.

5  Q.  And when you opened the garage door, what did you observe?

6  A.  I observed a subject known to me as Mr. Treanton kneeling or

7  on top of a pile of objects approximately four to five feet from

8  the ground.

9  Q.  I'm going to show you what's been entered as Government's

10  Exhibit 2a.  Does that picture show generally the nature of the

11  garage when you observed it?

12  A.  Yes.

13  Q.  Fair to say some of these items in the foreground have

14  fallen out with the door being opened, but, generally, that was

15  the condition of the garage you observed?

16  A.  Correct.

17  Q.  And so you see Mr. Treanton where?

18  A.  Mr. Treanton was piled up -- excuse me, not piled up, but on

19  top of probably the box area here.  There was a box with some

20  duct tape to the right of it, and there's like an open box

21  there.  He was up on top of those objects.

22  Q.  And what was he doing when you first observed him?

23  A.  When I first observed him, when the door first came open, to

24  the best of my recollection, he was on his knees on top of those

25  objects looking towards that west door where the other agents or

1  officers were at, at which point -- go ahead.  That's what I

2  first saw.

3  Q.  And was he doing anything at that point?

4  A.  No.  I mean, he was just on top of the objects.  He did turn

5  around and look at us as we announced ourselves as officers.

6  Q.  And so at that point, then, do you start -- you said you

7  announce yourselves as officers.  Do you give any commands or

8  make any other statements?

9  A.  Told him to turn around, show us your hands.

10  Q.  And what happens from there?

11  A.  From there, Detective Carter -- I observed Detective Carter

12  try to reach up and grab him, at which point Mr. Treanton turned

13  around.  He had a green flashlight in his hand that was held

14  above his head.  And at that point I also assisted Detective

15  Carter in grabbing on to Mr. Treanton, and then we escorted him

16  to the ground outside of the garage.

17  Q.  Can you describe generally the flashlight that you observed

18  him holding?

19  A.  Yeah.  I mean, it was approximately, I don't know, six to

20  nine inches long, probably a C or D cell battery flashlight.  I

21  don't know how big around that would be.  But, you know, big

22  enough that he could hold it in his hand, and I believed it

23  could be used as a weapon against me.

24  Q.  Just prior to pulling him off of the debris, did it appear

25  to you as though Mr. Treanton was attempting to climb towards

1  the man door?

2  A.  No.

3  Q.  He didn't appear to be making any progress in that area?

4  A.  No.

5  Q.  And so you said then you assist Detective Carter in pulling

6  Mr. Treanton out, and what happens then?

7  A.  We pulled Mr. Treanton to the ground.  He proceeded to, for

8  lack of a better term, I would call it, turtle up, pull his arms

9  in underneath his body.  And we were giving him instructions to

10  give us your hands, give us your hands, give us your hands, and

11  he was refusing to do that by keeping his hands under his body.

12  Q.  Can you describe what the weather conditions were like

13  generally on that day?

14  A.  Yeah.  It was overcast skies.  There was some snow and ice

15  in the driveway.  There was no precipitation at the time, but it

16  was chilly.  It was cold.

17  Q.  And at the location at the ground where you're at with

18  Mr. Treanton, was there snow and ice there?

19  A.  Yes.

20  Q.  At that point, when you're asking him to give -- or

21  commanding him to give you his hands, why do you want to get

22  control of his hands?

23  A.  He had just, you know, in my opinion, presented me with a

24  weapon that I thought he could hurt me with.  Also, he'd not

25  obeyed our commands up to that point so I want to be able to

1  control his hands so he can't hurt either me or Deputy Carter or

2  anybody else there.

3  Q.  At the time that you all approached the garage, did you know

4  whether anyone was in the garage?

5  A.  No.

6  Q.  Did you know what was in the garage?

7  A.  No.

8  Q.  So I believe we left off with Mr. Treanton turtling up with

9  his arms underneath of him, not obeying commands.

10 A.  Correct.

11 Q.  What happens then?

12 A.  We continue to give commands.  We received no response.  I

13 did observe Detective Carter strike Mr. Treanton in the face

14 with his hand, at which point Mr. Treanton -- or I was able to

15 gain control of Mr. Treanton's left arm, and with the assistance

16 of Deputy Weipert -- or Weipert, we were able to place him in

17 custody -- or, excuse me, in handcuffs, I mean.

18 Q.  And you mentioned that Detective Carter struck him one time

19 in the face with his hand.

20 A.  Correct.

21 Q.  Did you see him strike him with his hand any more than one

22 time?

23 A.  No.

24 Q.  Did you see him strike him with anything else?

25 A.  No.

1  Q.  Did you see anyone else strike him with anything else?

2  A.  No.

3  Q.  You mentioned then that Mr. Treanton was handcuffed.

4  A.  Correct.

5  Q.  Did you tell him that he was under arrest?

6  A.  No.

7  Q.  Did you hear anyone else tell him he was under arrest?

8  A.  No.

9  Q.  Did you observe Mr. Treanton's face at that time?

10 A.  Yes.

11 Q.  Did you observe any injuries?

12 A.  Yes.

13 Q.  Can you describe those, please?

14 A.  Yes.  There was an abrasion on Mr. Treanton's nose and maybe

15 a drop of blood on his mouth, maybe his lower lip.

16 Q.  I'm going to put on the screen there what's been marked as

17 Government's Exhibit 6.  Do you see the photo there?

18 A.  Yes.

19 Q.  Is that nose injury consistent with the injury that you

20 observed?

21 A.  Yes.

22 Q.  Was Mr. Treanton offered medical attention?

23 A.  Yes, he was.

24 Q.  And did he request or want that medical attention?

25 A.  He declined.

1          MS. GLASGOW:  I don't have any other questions for this

2   officer, Your Honor.

3          THE COURT:  Mr. Bell.

4                         CROSS-EXAMINATION

5   BY MR. BELL:

6   Q.  Detective Hopkins, my name is Murray Bell.  I have a couple

7   questions.

8   A.  Okay, sir.

9   Q.  You've had several occasions to come in contact with

10  Mr. Treanton?

11  A.  Approximately two to three.

12  Q.  Okay.  And on this day, you were in plain clothes, right?

13  A.  I was dressed in plain clothes, but I did have police

14  markings on my vest.

15  Q.  Okay.  Do you recall what kind of clothes Detective Carter

16  was wearing?

17  A.  I don't.

18  Q.  Do you recall whether potentially he was wearing camouflage

19  kind of clothes?

20  A.  I don't recall that.

21  Q.  You certainly know what I mean by camouflage-type clothes?

22  A.  Well, there's, you know, camouflage type like a camouflage

23  pattern shirt or if you're talking about like military fatigues.

24  I think there's a difference.

25  Q.  No.  I'm talking about the different colors and design.

1   A.   Yeah.   I don't recall what he was wearing.

2   Q.   Okay.   Now, where is the cigarette butt?

3   A.   Excuse me?

4   Q.   Where is the cigarette butt?

5   A.   I don't know.

6   Q.   Okay.   So you believe that there was a burning cigarette in

7   the garage?

8   A.   Yes.

9   Q.   And you saw the condition of the garage?

10  A.   Right.

11  Q.   And nobody took time to find the cigarette?

12  A.   Apparently not.

13  Q.   Okay.   You told us that he was -- you said he was just in

14  one location, he wasn't moving.   Is that what you're claiming?

15  A.   To the best of my recollection, yeah, he was not moving.

16  Q.   Okay.   Did you hear commands from the people at the

17  personnel door?

18  A.   I heard people -- or, excuse me, the officers, agents, for

19  lack of a better term, barking orders inside.   It's sounded like

20  they were yelling loudly at someone, and it sounded to me like

21  they were giving commands -- typical commands of, "Come to the

22  door," "Show us your hands," things like that, to the best of my

23  recollection.

24  Q.   Okay.   So at the time that you opened the garage door or

25  that Detective Carter opened the garage door, he could have

1  been -- Mr. Treanton could have been responding to a command to

2  go to that door; is that correct?  Yes or no?

3  A.  Mr. Weipert -- or Deputy Weipert had yelled around the

4  corner that they thought somebody was inside but they were not

5  receiving a response from the inside.

6  Q.  Okay.  You don't know that somebody opened the door and

7  looked inside?

8  A.  I don't.

9  Q.  And saw his head over the pile of trash?

10  A.  I was not on that side.

11  Q.  No.  You didn't read a report that said that or anything?

12  A.  No.

13  Q.  Okay.  So but clearly somebody could have given command to

14  go that way?

15  A.  Can you --

16  Q.  Go toward the personnel door.

17  A.  Gave commands to Mr. Treanton --

18  Q.  Yes.

19  A.  -- to go to the man door?

20  Q.  Yes.

21  A.  They could have.  I didn't -- I didn't hear that.

22  Q.  So he could have been following that command, correct?  When

23  he was going up over the debris, he could have been following

24  that command, correct?

25  A.  I just saw him not moving so I don't know.

1  Q.  How much time passed between the time the garage door -- the

2  overhead door was open and you guys took control of him?  When I

3  say take control, while he was still on the debris, I'll call

4  it.

5  A.  I would say between five and ten seconds.

6  Q.  Took you that long to get to him?

7  A.  I mean, he was up on the pile.  I mean, what's your

8  description of "took control of him"?

9  Q.  First hand contact, physical contact.

10  A.  First hand contact would probably be three to five seconds.

11  Q.  Okay.  And that's not a lot of time to judge whether he's

12  moving or just stalled or what, right?

13  A.  Correct.

14  Q.  So he could have been trying to climb over and you just

15  didn't give enough time to verify that's what was happening?

16  A.  Yeah.  In that three to five seconds, he didn't move.

17  Q.  Which way was he -- which way was his head facing when you

18  first saw him?

19  A.  His head -- as I explained earlier, he was looking towards

20  the west man door, so I would say his head was facing north and

21  west.

22  Q.  Now, just to give a little perspective so we can get this

23  clear, the overhead door is at the alley, and it's on the south

24  side, I think?

25  A.  Correct.

1  Q.  The man door is actually on the side of the garage, not on

2  the opposite end as the overhead door; is that correct?

3  A.  The west side, yes.

4  Q.  The west side, right.  But it's close up to -- the part of

5  the garage closest to the residence?

6  A.  Yes.

7  Q.  Okay.  You said that Detective Carter grabbed Mr. Treanton,

8  correct?

9  A.  Yes.

10 Q.  Did you see where he grabbed him?

11 A.  I believe it was up a shirt or -- I think maybe he had some

12 coveralls on.  Up towards the upper part of his body

13 (indicating).

14 Q.  In the front of his body or the back of his body?  Because

15 you're touching the front as you describe, and I just want to

16 make sure what you mean by that.

17 A.  Well, I mean, so I saw Detective Carter's hand go up to the

18 left of him from behind, if that makes sense, so maybe up

19 around.  I lost sight of Detective Carter's hand.  I was on the

20 right side of Mr. Treanton.

21 Q.  Okay.  And when he was extracted out -- I want to say

22 extracted from the garage.  That's the best word I can think of

23 at this time.

24 A.  Works for me, sir.

25 Q.  Okay.  When he was extracted from the garage, did you assist

1  with that?

2  A.   Yes.

3  Q.   And you turned -- the two of you turned him so he was facing

4  out looking out of the overhead door?

5  A.   I did not turn him.  I would --

6  Q.   Did Officer -- did Deputy -- or Detective Carter do it?

7  A.   From my recollection and what I saw from the right side of

8  Mr. Treanton, as Deputy Carter reached up and made physical

9  contact, the first physical contact with Mr. Treanton,

10  Mr. Treanton spun around.  Whether Deputy Carter spun him or

11  Mr. Treanton spun on his own, I couldn't be for sure.

12  Q.   Okay.  That's fair.  But at that -- at some point the two of

13  you, I've heard used the expression, "escorted" him to the

14  ground.

15  A.   I would say directed him to the ground.

16  Q.   Okay.  And that was with some force?

17  A.   I mean, yeah.  We're taking a full-grown man from on top of

18  a four- to five-foot pile and taking him to the ground, and --

19  the minimal force required was used.  I mean, we're just trying

20  to get him to the ground and out of the garage.

21  Q.   Okay.  And he went down face first onto the ground; is that

22  correct?

23  A.   Correct.

24  Q.   And wouldn't the natural reflex be to put your hands in

25  front of you so you don't mash your face on the ground?

1    A.   I would think that would be your natural reaction.

2    Q.   And his hands were underneath him?

3    A.   I don't know -- necessarily know that they got there because

4    he was trying to protect himself as he fell.

5    Q.   Okay.  I'm not asking you to speculate how they got there.

6    A.   Okay.

7    Q.   I'm asking you were they underneath him?

8    A.   Oh, yes, sir.  They were.  I'm sorry.

9    Q.   And it would have been a natural reflex to try to prevent

10   him from slamming into the ground?

11   A.   That is a natural human reflex, yes.

12   Q.   And you saw that Deputy Carter -- Detective Carter punched

13   him in the face at least once?

14   A.   Yes.

15   Q.   Could have been more than that?

16   A.   No.

17   Q.   Couldn't have been?

18   A.   No.

19          MR. BELL:  Can I have a second with my client?

20          THE COURT:  Yes.

21   BY MR. BELL:

22   Q.   After Mr. Treanton was placed in the car where he was

23   interviewed or the vehicle -- I think that was an SUV of some

24   type, wasn't it?

25   A.   I don't recall what kind of car it was.  I couldn't tell

1   you.

2   Q.   Okay.  After that, how long did you remain on site?

3   A.   I don't recall specifically.  I mean, five minutes, tops.

4   It wasn't very long.

5   Q.   At some point did you see Detective Carter reenact for

6   someone the events of taking Mr. Treanton to the ground?

7   A.   Not that I recall, no.

8   Q.   Not that you recall?  So you're not excluding the

9   possibility?

10  A.   Yeah.  If he did, I -- I didn't see it.  I don't recall him

11  doing that.

12  Q.   Okay.  Now I'm showing you Exhibit -- excuse me.  I'm

13  showing you Exhibit 2.  Is that 2a or just 2?  2a.

14  A.   Okay.

15  Q.   We've looked at that before, and you've seen it, right?

16  A.   Yes.

17  Q.   And are you saying that he was up in this area by this box?

18  A.   I would say it was somewhere more towards the middle of the

19  garage.  And by "middle," I mean middle of that doorway.  So

20  your hand was to the left of that doorway opening, and I would

21  say he was maybe more, as we're looking at it, towards the right

22  or the east.

23  Q.   Would you do me a favor, put your hand on -- your finger on

24  the screen --

25  A.   Okay.

1   Q.  -- and draw a circle where about you think his head was?

2   A.  His head?

3   Q.  Head.

4   A.  His head was probably more up here (indicating).

5   Q.  Okay.  Now, if his head was there, he couldn't raise his

6   hands in the air very well, could he?  I mean, there's a garage

7   door over his head now, right?

8   A.  Yeah.  I don't want to speculate whether he could raise his

9   hands up.  He raised his hands up when he turned around, that

10  was certainly in the air, at me.

11  Q.  And you interpreted it in one way, right?

12  A.  Correct.

13  Q.  And certainly where you show the -- actually, where you show

14  his head, wherever that was, if he'd have stood up there, he

15  would have bumped his head likely, right?

16  A.  I would think so, yes.

17  Q.  Okay.  Do you know if he might have been more upright when

18  the garage door started to open and he had to duck so that it

19  didn't hit his head?

20  A.  I don't recall that happening.

21  Q.  Okay.  But could it be that you couldn't see it?

22  A.  Yeah.  I couldn't see in as the garage was going up until

23  the garage door was up past his head.

24  Q.  Yeah.  And you've got his head up there pretty far crawling,

25  right?

1   A.   I didn't see him crawling.

2   Q.   Okay.  Was he on hands and knees at the time you saw him?

3   A.   He was just on his knees.

4   Q.   Was he upright or was he leaning forward, was he leaning

5   back?

6   A.   I believe he was, I mean, upright.  Maybe kind of hunched

7   down a little bit, but upright.

8   Q.   Maybe avoiding the garage door?

9   A.   Yeah.  Maybe.  I don't -- I don't know.

10  Q.   All right.

11          MR. BELL:  I don't have any further questions.

12          Thank you, Your Honor.

13          THE COURT:  Ms. Glasgow?

14          MS. GLASGOW:  Nothing, Your Honor.

15          THE COURT:  You may step down.

16          THE WITNESS:  Thanks, Your Honor.

17                                  (Witness excused.)

18          THE COURT:  Do you have any other evidence you would

19  like to present?

20          MS. GLASGOW:  Yes, Your Honor.  The Government calls

21  Mike McVey.

22          MR. BELL:  Oh, Your Honor, I'm sorry.  I want the

23  officers to have instructions that they are not to discuss the

24  testimony with those who have not yet testified.

25          THE COURT:  So witness sequestration order,

1 essentially?

2          MR. BELL:  Essentially.

3          THE COURT:  Okay.  Yes.  Shouldn't talk to each other.

4          Perfect.

5          MS. GLASGOW:  I'm sorry.  Did I miss something?

6          THE COURT:  He just asked for a witness sequestration

7 order, essentially.

8          Officer McVey, come on forward.  Mr. Chrismer will

9 swear you in before you take the stand.

10          MICHAEL McVEY, GOVERNMENT'S WITNESS, SWORN

11          THE DEPUTY CLERK:  Thank you.  Please have a seat.

12          THE COURT:  You can begin whenever you're ready.

13          MS. GLASGOW:  Thank you.

14                         DIRECT EXAMINATION

15 BY MS. GLASGOW:

16 Q.  Sir, would you please state and spell your name for the

17 record.

18 A.  Michael McVey, M-c-V-e-y.

19 Q.  What is your current occupation?

20 A.  I'm a special agent with the Iowa Division of Criminal

21 Investigation.

22 Q.  How long have you been with the Division of Criminal

23 Investigation?

24 A.  Since 2007.

25 Q.  And what was your role prior to that?

1  A.  I was a state trooper from 1993 till 2007.

2  Q.  And did you have prior law enforcement experience before

3  1993?

4  A.  Yes.  I was a deputy sheriff with the Linn County Sheriff's

5  Department.

6  Q.  Do you have a specific assignment within the Division of

7  Criminal Investigation currently?

8  A.  Yes.

9  Q.  What is that?

10 A.  I'm assigned to the Internet Crimes Against Children Task

11 Force, cybercrime unit.

12 Q.  Is that sometimes referred to as ICAC?

13 A.  Yes.

14 Q.  How long have you been assigned to the cybercrimes unit?

15 A.  Since -- now since 2010.

16 Q.  Did you have a prior assignment there?

17 A.  Yes.  I was there briefly in 2007.

18 Q.  Is your role now preliminarily -- excuse me -- almost

19 exclusively child exploitation crimes?

20 A.  Yes.

21 Q.  And has it been that since approximately 2010?

22 A.  Yes.

23 Q.  I want to turn your attention to January of 2020.  Were you

24 involved in the investigation of Justin Treanton as it related

25 to child pornography or child exploitation?

McVEY - DIRECT                              54

1  A.  Yes.

2  Q.  I want to turn specifically to January 30th, 2020.  And were

3  you involved in an investigative action related to that case on

4  that day?

5  A.  Yes.

6  Q.  I'm going to show you what's been marked as Government's

7  Exhibit 3.  Is that a search warrant that you prepared and

8  obtained?

9  A.  Yes.

10         MS. GLASGOW:  At this time I'd offer Government's

11  Exhibit 3.

12         MR. BELL:  No objection.

13         THE COURT:  Government Exhibit 3 is received.

14                  (Government Exhibit No. 3 was

15                   offered and received in evidence.)

16         THE COURT:  Because it does identify, essentially, the

17  identity of the victim, I am going to seal Government Exhibit 3.

18         MS. GLASGOW:  Your Honor, I would also ask that I be

19  allowed to file 8 and 9 under seal.

20         THE COURT:  Any objection, Mr. Bell?

21         MR. BELL:  Remind me what they are.

22         THE COURT:  They are the two stipulations the parties

23  entered into.

24         MR. BELL:  No objection.

25         THE COURT:  8 and 9 will also be sealed.

1  BY MS. GLASGOW:

2  Q.  Agent McVey, were you involved in execution of that search

3  warrant on January 30th, 2020?

4  A.  Yes.

5  Q.  And on that date, were you wearing any specific uniform?

6  A.  No.

7  Q.  What was your attire?

8  A.  As I recall, civilian attire.  I might have been wearing

9  511s.  I don't recall.  But it was civilian attire, I'd call it.

10         THE COURT:  What's a 511?

11         THE WITNESS:  I'm sorry.  Like the pants with the cargo

12  pockets.  I apologize.

13  BY MS. GLASGOW:

14  Q.  Not marked, just kind of law enforcement style?

15  A.  Yes.

16  Q.  As a part of that day's activities, did you initially

17  execute the search warrant at the residence believed -- where

18  Mr. Treanton was believed to be living?

19  A.  Yes.

20  Q.  And during the execution of that search warrant, did you

21  obtain information about Mr. Treanton's whereabouts and his use

22  of various cell phones?

23  A.  Yes.

24  Q.  And that information was then ultimately put in a second

25  search warrant for cell phones; is that correct?

1  A.  Yes.

2  Q.  Was Mr. Treanton located at that residence initially?

3  A.  No.

4  Q.  And was other action taken to attempt to locate

5  Mr. Treanton?

6  A.  Yes.

7  Q.  Ultimately, is there information obtained that Mr. Treanton

8  may be at 2917 Belleview Avenue in Bettendorf, Iowa?

9  A.  I believe that's the correct address, yes.

10  Q.  And do you ask other officers or other agencies for

11  assistance in attempting to find Mr. Treanton at that location?

12  A.  Yes.

13  Q.  And then do you yourself go to that location?

14  A.  Yes.

15  Q.  And what do you do when you get there?

16  A.  Myself and Special Agent Allen and, I believe, a deputy in

17  uniform went to the garage area after other officers, as I

18  understand it, had made contact with somebody who lived there

19  and said that the garage -- nobody should be in the garage and

20  that we could look in the garage.

21  Q.  And so prior to being at the garage, there was contact from

22  other law enforcement with the homeowner who gave consent to

23  search the garage; is that fair?

24  A.  Somebody who lived there, yes, as I understand it.

25  Q.  So yourself, Special Agent Allen, another deputy go to the

1  side of the garage; is that correct?

2  A.  Yes.  The walk-in door.  I'm sorry.

3  Q.  And then you were aware that there were other agents that

4  were at the overhead door?

5  A.  Yes.  Other law enforcement are in that alley side, yes.

6  Q.  When you're there at the man door, what do you do?

7  A.  Went inside.  I don't know who went in first.  I was behind

8  them.  Went inside and -- I don't know who saw him first, but

9  somebody saw a head moving around towards the drive-through

10 door.

11 Q.  And, I'm sorry, I want to back up and clarify two things.

12 Prior to the investigative action on that day, were you involved

13 in giving a briefing to other law enforcement that was going to

14 be involved with the search warrants that day?

15 A.  I was there.

16 Q.  And as a part of that briefing, was there instruction given

17 about what the purpose of that day's activities were?

18 A.  Yes.

19 Q.  And what was that?

20 A.  That we were executing a search warrant.

21 Q.  Was there any comment made about whether arrests were to be

22 made?

23 A.  We stated we were not going to be arresting a suspect.

24 Q.  What was the purpose of attempting to locate Mr. Treanton,

25 then, later that day?

1  A.  To find the cell phone that we believed he might have, or

2  cell phones, and to interview him.

3  Q.  So you're standing at the man door, and are commands given

4  through the door, or what happens?

5  A.  As soon as they saw him moving around or saw the person

6  moving around, I left to go get my vehicle, which was parked out

7  in the street a ways away.  I left to get my vehicle, so...

8  Q.  So did you see any interaction between law enforcement and

9  Mr. Treanton while he was at the garage?

10 A.  No.

11 Q.  And so I'm going to put up --

12 A.  I might want to clarify.  I believe somebody did say

13 something to the person that was moving, you know, "We see you,"

14 or "Justin," might have said his name, and he acknowledged.

15 That's the extent of what I recall occurred.

16 Q.  And I've put now on the screen what's been marked as

17 Government's Exhibit 2.  Do you see that item?

18 A.  Yes.  Yes.

19 Q.  So when you leave the area of the garage, why did you leave

20 the garage?

21 A.  Because my -- my vehicle was parked out on the street.

22 Q.  And what do you do with your vehicle?

23 A.  I -- I got my vehicle, drove it around, and I drove it to

24 the garage area, the alley in front of the garage.

25 Q.  And why did you go get your vehicle?

1  A.  So that we could interview him in my vehicle.  It was

2  warmer.

3  Q.  And was the temperature the main reason for taking the

4  interview into the vehicle?

5  A.  Also that and a place to interview him.  I mean, climate.

6  Q.  So you'd get your vehicle, come back around in the alley.

7  What do you see when you get back into the alley area?

8  A.  I see Steve with the suspect.  And I don't know if he's just

9  getting him up or if he had gotten him up, and he's standing

10 with the suspect, and he had handcuffs on.

11 Q.  And is that --

12        MR. BELL:  Can I ask -- you used the name Steve.  I

13 don't know what the last name that goes with that.

14        THE WITNESS:  Oh, I apologize.  Special Agent Allen.  I

15 apologize.

16        MR. BELL:  Thank you.

17        THE COURT:  Go ahead.

18 BY MS. GLASGOW:

19 Q.  And when you observe Special Agent Allen and the suspect,

20 where are they located?

21 A.  They're in front of the walk -- the drive-through, I'm

22 sorry, the drive-through door.

23 Q.  And what do you observe happen then?

24 A.  Steve's -- like I said, he's either -- excuse me.  Special

25 Agent Allen is either standing him up or he was stood up next to

1  him.

2  Q.  At the time that you drive back around and you're making

3  observations, do you observe anyone physically strike, hit,

4  kick, anything, Mr. Treanton?

5  A.  No.

6  Q.  And so what does Special Agent Allen do at that point, then?

7  A.  He's standing there.  I park my vehicle.  I get out and

8  basically interact with him, "What's going on here?"  You know,

9  because I -- I was irritated that he was in handcuffs, and I

10 didn't understand what was going on.

11 Q.  And what happens from there?

12 A.  Special Agent Allen takes him out of handcuffs, tells him

13 he's not under arrest, between the two of us ask if he'd like --

14 if we could talk to him, interview him, and ask him if he wants

15 to have a seat in the front seat of my vehicle.

16 Q.  And does he respond to that?

17 A.  Yes.

18 Q.  What does he say?

19 A.  He said yes, and he walks around to the passenger side of my

20 vehicle.

21 Q.  And so where was Mr. Treanton at when the handcuffs are

22 taken off?

23 A.  He's at the driver's side of my vehicle.  Before -- before

24 that interaction I just spoke of, Steve -- excuse me -- Special

25 Agent Allen had taken the handcuffs off, you know, because, once

1    again, we told him he's not under arrest.

2    Q.  And so Mr. Treanton walks around the side, the passenger

3    side?

4    A.  Yes.

5    Q.  Is he escorted or does he walk alone?

6    A.  I wouldn't say he's escorted.  I believe that Special Agent

7    Allen walked partway to the passenger side with him.  I don't --

8    I don't think he walked all the way, because if you listen to

9    the audio, you can actually hear Mr. Treanton getting in my

10   vehicle, and at approximately that same time, Special Agent

11   Allen is placing something on the dash of my vehicle on the

12   driver's side.  So how far he walked him -- walked with him, you

13   know, I don't know, but he didn't escort him, no.

14   Q.  And he then just opened the door himself and got in himself?

15   A.  Yes.

16   Q.  At that point is that about when your audio recording kicks

17   on?

18   A.  I think my -- if I recall, I think my audio recording was on

19   briefly before that.  I mean, if you listen to it, you can tell

20   the interaction, yes.

21   Q.  I'm going to show you -- Government's Exhibit 1 is a

22   recording of your audio.  Have you had a chance to review your

23   audio from this encounter?

24   A.  Yes.

25   Q.  And does it accurately record the conversation with

1 | Mr. Treanton?

2 | A.  Yes.  It appears to to me.

3 |         MS. GLASGOW:  At this time I'd offer Government's

4 | Exhibit 1.

5 |         MR. BELL:  No objection.

6 |         THE COURT:  Government Exhibit 1 is admitted.

7 |                     (Government Exhibit No. 1 was

8 |                      offered and received in evidence.)

9 | BY MS. GLASGOW:

10 | Q.  At some point does Mr. Treanton make a comment about a phone

11 | or phones being dropped?

12 | A.  Yes.

13 | Q.  And what is that?

14 | A.  That was when I had first gotten up there and the handcuffs

15 | were being taken off.  During that period of time, he mentions

16 | that he lost his phone.

17 | Q.  Was there a question presented or does he just make the

18 | comment that he lost his phone?

19 | A.  No.  He makes the comment that he lost his phone.

20 | Q.  During the time that Mr. Treanton is in the vehicle, then --

21 | is this an unmarked vehicle?

22 | A.  Yes.  It's a blueish-green Durango.

23 | Q.  And where is Mr. Treanton seated?

24 | A.  Passenger side, front seat.

25 | Q.  And was that door locked or unlocked?

1   A.   It was unlocked.

2   Q.   And where were you seated?

3   A.   I was seated in the driver's side, driver's seat.

4   Q.   Was there anyone else in the vehicle?

5   A.   Initially, no, and then Special Agent Allen got into the

6   back seat.  I don't recall if he got into the right or left, but

7   I believe he got into the right back seat, the passenger side

8   back seat.

9   Q.   And was there anyone else in the vehicle?

10  A.   No.

11  Q.   Were there times during the interview where you stepped out

12  of the vehicle for brief periods?

13  A.   Yes.

14  Q.   And what was the reason for that?

15  A.   Just to check and see if they had found the phone or, you

16  know, things like that.  Just to interact with the officers.

17  Q.   And is --

18  A.   They were a ways from the vehicle.

19  Q.   So when we're hearing maybe doors opening and closing, is

20  there anyone other than yourself or any other law enforcement

21  entering the vehicle or exiting the vehicle or approaching the

22  vehicle?

23  A.   Only at one point, as I recall.  And, once again, it's on

24  the video.  An officer comes up to the vehicle and inquires

25  about handcuffs.  I think it was the handcuffs that had been on

1  him.  And, actually, at that point Mr. Treanton actually gave

2  them a pair of my handcuffs that were laying -- that were in the

3  pocket of the car.

4         And you listen to that on the video, I make a comment

5  about it, you know, "Don't be giving away my equipment," or

6  something like that.  We chuckled about it, and I think he said

7  something like, "My bad," or something like that.

8  Q.  I want to clarify.  You've discussed a video.  It's just an

9  audio recording; is that correct?

10  A.  I apologize.  It's an audio.

11  Q.  And so then during the course of the interview, you're just

12  in plain clothes; is that correct?

13  A.  Yes.

14  Q.  Is Special Agent Allen also in plain clothes?

15  A.  Yes.

16  Q.  Were there any weapons displayed during the interview?

17  A.  Not that I recall.

18  Q.  You didn't draw your gun?

19  A.  No.  No.

20  Q.  Certainly you would have recalled or noted if Special Agent

21  Allen had drawn a gun or other weapon?

22  A.  Not that I know of.

23  Q.  Was there any other force used during the interview?

24  A.  No.

25  Q.  There comes a time in the interview, about an hour and 12

1  minutes in, when you asked Special Agent Allen if he would step

2  out of the vehicle and talk to you for a minute.  Do you recall

3  that?

4  A.  Yes.

5  Q.  And what occurs during that interaction?

6  A.  I believe that's the point where I told him that the county

7  attorney asked that we arrest him.  I believe that's the time

8  you're talking about.

9  Q.  And so we had discussed that earlier in the day you had

10  briefed other officers that there were not to be arrests made;

11  is that correct?

12  A.  That is correct.

13  Q.  And when you all arrived at the garage, was there intention

14  that Mr. Treanton would be arrested?

15  A.  No.

16  Q.  At what point did that decision change?

17  A.  The county attorney was concerned with him going back and

18  staying at the residence, the fact that he wouldn't have a place

19  to stay so he'd go back to the residence, basically a threat to

20  the victim, and that was their -- and, as I recall, the

21  difficulty we had in finding him.  So she suggested that he be

22  arrested or said he should be arrested.

23  Q.  Did it come out as a part of the interview that Mr. Treanton

24  was somewhat transient?

25  A.  Yes.

1  Q.  And was that new information to you?

2  A.  Yes.

3  Q.  And so this conversation with the county attorney -- did you

4  have a conversation with the county attorney?

5  A.  Yes, I did.

6  Q.  And had prior law enforcement -- or, excuse me, other law

7  enforcement had contact with the county attorney before you?

8  A.  That, I don't know.  I think they might have.  I don't know

9  that for sure.

10  Q.  And so at what point is it that you speak with the county

11  attorney?

12  A.  I believe it was at that point you're talking about when I

13  got out of my vehicle and I spoke to her on the phone.

14  Q.  And then from there, what happens?

15  A.  Well, then I went back to the vehicle and I asked Special

16  Agent Allen if he'd step out of the vehicle and talk to me a

17  minute.  And at that point I -- I told him that we were told

18  that we needed to arrest him, and he was clearly upset with that

19  conversation.

20  Q.  And when you say "he" was upset, who are you referring to?

21  A.  Special Agent Allen.

22  Q.  And that was going to be on state charges; is that correct?

23  A.  That's correct.

24  Q.  And the purpose of your investigation was for federal

25  charges; is that fair?

1  A.   That's correct.

2  Q.   Prior to your conversation with the county attorney, if

3  Mr. Treanton had said that he was done talking and wanted to

4  leave, what would have happened?

5  A.   He would have walked away.

6  Q.   He would have just been allowed to open the door and leave;

7  is that correct?

8  A.   That is correct.

9  Q.   During your conversation with Mr. Treanton, how would you

10 describe his intelligence or his interactions with you?

11 A.   I thought they were friendly.

12 Q.   I'm going to show you what's been marked as Government's

13 Exhibit 4.  Do you recognize that document?

14 A.   Yes.

15 Q.   What is it?

16 A.   It's a "Consent To Search Mobile Device."

17 Q.   And is that a form that you filled out?

18 A.   Yes.  It looks like my handwriting.

19 Q.   And did you indicate your name there on the form?

20 A.   Yes.

21 Q.   And did you ask Mr. Treanton for consent to search devices?

22 A.   Yes, I did.

23 Q.   And did you witness him execute this form?

24 A.   Yes.

25            MS. GLASGOW:  At this time I would offer Government's

1   Exhibit 4.

2            MR. BELL:  No objection.

3            THE COURT:  Government Exhibit 4 is admitted.

4                      (Government Exhibit No. 4 was

5                       offered and received in evidence.)

6   BY MS. GLASGOW:

7   Q.  And is it fair to say that the procedure of asking for

8   consent was captured on the audio, but that's just the written

9   documentation of the consent as well?

10  A.  Yes.

11  Q.  I'm going to show you what's been marked as Government's

12  Exhibit 5.  Do you recognize that document?

13  A.  Yes, I do.

14  Q.  And is that a search warrant that you subsequently obtained

15  for cell phones believed to be used or belonging to

16  Mr. Treanton?

17  A.  Yes.

18            MS. GLASGOW:  At this time I'd offer Government's

19  Exhibit 5.

20            MR. BELL:  No objection.

21            THE COURT:  Government Exhibit 5 is admitted.

22                      (Government Exhibit No. 5 was

23                       offered and received in evidence.)

24            THE COURT:  And I don't recall, does this one also

25  describe or otherwise identify who the victim is?

1          MS. GLASGOW:  Yes, Your Honor.  I would ask for 1 and 5

2    to also be sealed.

3          MR. BELL:  May I, Your Honor?

4          THE COURT:  Yes.  Go ahead.

5          MR. BELL:  Just for the Court's understanding, the

6    victim was -- is deceased because of being killed in a fire that

7    happened in that residence about a month after this time.

8          THE COURT:  The 4-year-old?

9          MR. BELL:  Yes.  That was his -- Mr. Treanton's mother,

10   her significant other, and the 4-year-old were killed in a fire.

11         THE DEFENDANT:  That happened January of this year.

12         THE COURT:  Okay.  I think we can still protect the

13   little girl's privacy rights.

14         Government Exhibits 1 and 5 are admitted under seal.

15   BY MS. GLASGOW:

16   Q.  I'm going to show you what's been marked as Government's

17   Exhibit 7.  Do you recognize that document?

18   A.  Yes.

19   Q.  What is it?

20   A.  It's a driver's license information and criminal history.

21   Q.  And is that related to Justin Treanton?

22   A.  Yes.

23   Q.  And was that basically a criminal history that you ran

24   related to this investigation?

25   A.  Yes.

1  Q.  Outlining Mr. Treanton's prior arrests and convictions?

2  A.  Yes.

3        MS. GLASGOW:  At this time I'd offer Government's

4  Exhibit 7.

5        MR. BELL:  Could I look at it briefly?

6        No objection, Your Honor.

7        THE COURT:  Government Exhibit 7 is admitted.

8                    (Government Exhibit No. 7 was

9                     offered and received in evidence.)

10       MS. GLASGOW:  And I would ask to offer that under seal

11 as well, Your Honor.

12       THE COURT:  And it will be sealed as well.

13       MS. GLASGOW:  I don't have further questions at this

14 time, Your Honor.

15       THE COURT:  Mr. Bell.

16       MR. BELL:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18 BY MR. BELL:

19 Q.  What is your title; detective, special agent?

20 A.  Agent.  You can call me agent.  I'm a special agent.  I'm

21 sorry.

22 Q.  Okay.  I'll leave that alone.

23 A.  Yes.

24 Q.  Every once in a while I get somebody who doesn't say they're

25 special, and I have to comment on it; "You're the only law

1   enforcement officer I ever saw that didn't think he was

2   special."

3         Okay.  Let's go back to when you're standing at the

4   personnel door or the man door of the garage.  Do you know who

5   was there with you?

6   A.  Yes.  As I recall, it was -- I know Special Agent Allen was

7   there, and I believe there was a deputy that had walked up there

8   with us.  I believe it was those, as I recall it.

9   Q.  Okay.  And did you go actually inside of the garage?

10  A.  Yes, I did.

11  Q.  Describe what you could see there in the garage when you got

12  inside.

13  A.  There was a lot of clutter.  And as I recall -- and I'd have

14  to refer to my search warrant, but as I recall, there was like a

15  bed to the left and maybe some blankets, I believe.

16  Q.  Now, all of this -- I'm going to call it clutter.

17  A.  Yes.

18  Q.  Whatever it was, did that reach all the way to the back of

19  the garage or was there a cleared area?

20  A.  It was -- it was mostly towards the back of the garage,

21  towards the drive-through door, sir.

22  Q.  Okay.  The Court earlier asked about the size of this

23  cleared area.  Could you estimate how big it was?

24  A.  Well, the -- I don't know for sure what you mean, but when

25  you first walk in the door, there was a cleared area there.  And

1  that was probably -- you know, four of us could have stood

2  there, you know, in the area.  I would say maybe four feet wide,

3  six feet long.  I'm guessing.

4  Q.  Okay.

5  A.  And that's just a guess.

6  Q.  And then did the bed butt up against that, the area you just

7  described?

8  A.  Yes.  As I recall, yes.

9  Q.  Okay.  And was there space on either side of the bed?

10  A.  I couldn't -- I can't remember that part.

11  Q.  All right.  Thank you.  Just wanted to try to clear that up

12  for the judge.

13  A.  Yes.

14  Q.  Now, who gave the -- when you met in the morning before the

15  search of the residence --

16  A.  Uh-huh.

17  Q.  -- who gave the briefing?

18  A.  That was Special Agent Allen.

19  Q.  Okay.  And your recollection is he said clearly, "We're not

20  going to arrest him"?

21  A.  Yes.

22  Q.  But you found the suspect -- or Mr. Treanton in handcuffs

23  when you arrived at the garage?

24  A.  That is correct.

25  Q.  And you just made a face indicating less than satisfaction.

1  A.  I was not.

2  Q.  Not happy?  Why?

3  A.  Because there was no intention to arrest him, so when I

4  pulled in there and saw him in handcuffs, I was confused about

5  what was going on.  So I guess the better way to say it would be

6  that I was confused and concerned about what was going on, why

7  was he in handcuffs.

8  Q.  Do you know who Detective Carter is?

9  A.  Only from what I've seen in reports.  And I know that he was

10  one of the individuals that was there.  So I don't -- I wouldn't

11  know him.  I don't know him by --

12  Q.  You don't know if he's out in the hall?

13  A.  He was.  I believe he was one of the individuals out in the

14  hallway.

15  Q.  Okay.

16  A.  But I don't know him.

17  Q.  Was he at the briefing?

18  A.  I don't believe so.

19  Q.  Okay.

20  A.  I'm not sure on that, but I don't believe he was.

21  Q.  Okay.  And do you know if he was standing with Mr. Treanton

22  when you arrived and saw Mr. Treanton in cuffs?

23  A.  I don't think he was.  I think when I got up there, I think

24  the only person that was standing with Mr. Treanton -- and I

25  want to clarify that.  I think -- I really don't remember for

1  sure if Special Agent Allen was just getting him up or if he was

2  standing up, but I'm pretty sure he was standing up as I was

3  pulling up.

4          You know, I want to clarify that because, you know, he

5  could have still been laying on the ground and Steve getting him

6  up as I was pulling into the alley.  You know what I mean, I

7  don't -- you know, I was paying attention to my driving too so I

8  don't -- I'm not real sure.

9  Q.  And, of course, he needed assistance getting up because he

10  was handcuffed behind his back?

11  A.  I believe so, yes.

12  Q.  Okay.  Now, when he was in the car with you and you were

13  questioning him -- actually, before, I think, you started

14  questioning him, you may have said, "What happened?" or

15  something to that nature.  What did he describe to you?

16  A.  I don't know the exact words.

17  Q.  We're big boys -- big boys and girls.  You can use whatever

18  words he used.

19  A.  I don't know exactly what he said.  And it's on the audio

20  that I think that he said something to the effect of, "He beat

21  the" -- "He kicked the shit out of me," or something like that.

22  I apologize, but I think something to that effect.

23  Q.  Right.  And you asked him who?

24  A.  I believe I might have.  Honestly, I'd have to listen to the

25  video, but I believe so.

1  Q.  And did he tell you who it was?

2  A.  I know he did say who it was.  He pointed or said, "That

3  person over there," or he might have said, "The person over

4  there in camouflage."  I don't recall.

5  Q.  But his response was he got beat up?

6  A.  That's what he had said, yes, or in so many words.

7  Q.  Okay.  When you first went into the garage at the man door

8  with the other people who went in there, I think you indicated

9  that someone said, "We see you over there."

10  A.  Yes.

11  Q.  They could see his head above the top of the debris?

12  A.  Uh-huh.

13  Q.  Is that a yes?

14  A.  Yes.  I'm sorry.  I thought you were continuing with the

15  question.  I apologize.  Yes.

16  Q.  No, no.  I mean the "Uh-huh" is not appropriate.

17  A.  You are correct, sir.  I apologize.

18  Q.  You've done this, I think, at least once before.

19  A.  Yes.

20  Q.  And somebody gave him -- made comments to him or gave him

21  commands?

22  A.  Yes.

23  Q.  Do you think anybody said to him, "Come to us.  Come over

24  here"?

25  A.  I'm not sure.  Like -- as I said, when they first

1    encountered him, you know, somebody might have said something

2    like that as I was turning around to go out of the garage.

3    Q.   Right.

4    A.   I'm just -- I'm not sure.

5    Q.   You certainly can't exclude that possibility?

6    A.   Yes.  I can't exclude that.

7    Q.   Okay.  As you were interviewing him, how many other

8    police -- law enforcement agencies were involved?  Let's start

9    in the morning at the briefing.  How many law enforcement

10   agencies -- not officers, agencies -- were involved, to your

11   knowledge?

12   A.   To my knowledge, it was Bettendorf Police Department and

13   Scott County, to my knowledge.

14   Q.   And DCI?

15   A.   I apologize.  Yeah.  And DCI.  I meant in addition to me and

16   Special Agent Allen.

17   Q.   And Homeland Security?

18   A.   Yes.  You're correct.

19   Q.   Okay.  And as you're interviewing Mr. Treanton, how many

20   people are standing around?  How many officers are standing

21   around?

22   A.   Okay.  To clarify -- to clarify, so my vehicle's parked in

23   the alleyway.

24   Q.   Correct.

25   A.   And myself and Special Agent Allen are with him in the

1    vehicle.  The other officers -- and this is just an

2    approximation, and I'm basing this off the fact that, you know,

3    you park a car in front of the garage door, and I'm in the

4    middle of the alley -- they're probably about 25 feet away at

5    the garage door.

6    Q.  How many other people?  How many officers were standing

7    around the garage door?

8    A.  Well, and once again, I want to be careful when I say here.

9    There's -- as I recall, there were some other officers that had

10   shown up, might have left, you know, and then other officers had

11   showed up later.  Like, for instance, one of the deputies who

12   had called the county attorney, you know, he'd showed up a

13   little bit later.

14          So I would say while I was talking to him, four --

15   four, maybe, officers over there.  I'm just not sure.

16   Q.  Were there vehicles also?

17   A.  I think there might have been one other vehicle.  There was

18   one vehicle that showed up behind me.  I know that was the

19   deputy from Scott County.  He'd showed up.  And when I say

20   "behind me," it was he'd kind of pulled into the driveway of the

21   house next to it, so not directly behind my vehicle.  And then I

22   believe there was the other officers that had come to the

23   drive-through door.  I think their vehicle may have been parked

24   up the alley from me.

25   Q.  Okay.  I'm showing you Government's Exhibit 2a, which is a

1  photograph of the back of the garage.  Have you seen that?  Do

2  you recognize that?

3  A.  Yes.

4  Q.  Okay.  And I think we've already agreed that some of this

5  stuff has come out of the garage after the door was opened; that

6  is, the green blanket, stuff on it?

7  A.  Yes.

8  Q.  Does that make sense to you?

9  A.  Yes, I believe so.

10  Q.  Okay.  And the question I have is, when you're sitting in

11  your car, it's across the alley from this picture, from the

12  garage?

13  A.  Yes.

14  Q.  What side of your car is toward the garage?

15  A.  The driver's side.

16  Q.  Okay.  So you came in from this side (indicating) --

17  A.  Yes.

18  Q.  -- and parked?

19  A.  Yes.  Your finger is pointed the direction my car would be

20  facing.

21  Q.  That's right.  Okay.  And you think there was a car behind

22  you?

23  A.  Well, eventually there was because I walked over to that

24  vehicle when the phone call was made to the county attorney.

25  And then also, the direction your finger was pointed, I don't

1  recall where, but I think there was a vehicle they had parked up

2  the alley when they walked towards the drive-through door.

3  Q.  Okay.  Now, was there any reason for all those officers to

4  be there?

5  A.  Initially, the officers that were there as far as us walking

6  into the garage door, not knowing what we're going to encounter,

7  I would say, you know, that was probably a safe number.

8  Q.  Right.

9  A.  Yes.  At that point.  Towards the end, no.  I think, you

10 know, after he'd gotten into my vehicle and we were interviewing

11 him, I don't -- I don't think there was a need for any

12 additional officers.

13 Q.  But they still hung around?

14 A.  Yes.

15 Q.  Okay.  And certainly I think what you're telling us is once

16 he was in the car, you and Special Agent Allen could have

17 handled whatever the situation might be?

18 A.  Yes.  With the exception of, and this is noted on the

19 recording if you listen to it, I think some of those officers

20 thought we might be getting a search warrant for the -- possibly

21 be getting a search warrant for the garage, and I think that's

22 why they might have been hanging around.  And that's noted on

23 the recording.

24 Q.  That was just speculation on your part?

25 A.  That's just speculation on my part.

1  Q.  All right.  Nobody told you that?

2  A.  No.  I think in the search warrant -- excuse me -- I think

3  in the audio, if you listen to it, and I want to make sure I'm

4  correct here, but I believe one of the -- and this is another

5  way you can tell how far away they were, because of how loudly I

6  had to speak, but one of them walked up towards my car and said,

7  "Hey, are we going to need an SW," referring to the garage,

8  so...

9  Q.  Was it your thought that you wanted the garage searched?

10 A.  Hadn't decided yet.  At that point, I hadn't decided yet.  I

11 didn't know if we were going to, you know, need a search warrant

12 for the garage or not.  You know what I'm saying, I'm still

13 talking to the individual and --

14 Q.  Right.

15          MR. BELL:  Can I have a second with my client?

16          THE COURT:  Yes.

17          MR. BELL:  Thank you, Special Agent McVey.  I have no

18 further questions.

19          THE COURT:  Ms. Glasgow.

20          MS. GLASGOW:  Nothing further.

21          THE COURT:  All right.  You're excused, Agent McVey.

22                              (Witness excused.)

23          THE COURT:  Any other evidence, Ms. Glasgow?

24          MS. GLASGOW:  I have one more officer.

25          THE COURT:  About how long will that officer take?

1          MS. GLASGOW:  I think probably 15 to 20 minutes is

2    reasonable.

3          THE COURT:  Okay.  Mr. Bell, do you have evidence that

4    you intend to present as well?

5          MR. BELL:  Well, once the Government is done, I have to

6    have a few minutes with my client to make a determination.

7          THE COURT:  Okay.  What I'm trying to decide is whether

8    or not we need to continue this to another date and finish it at

9    that time or whether we can get it done now.  It is five minutes

10   to 5 at this time.  If we go past 5 o'clock, we have to pay

11   everybody overtime, and we have to keep a courthouse that

12   otherwise closes open, which is not ideal.

13         So unless the parties are confident we can get this

14   done shortly, then I think we're safer to extend it to another

15   day and finish it at that time.

16         But thoughts, Ms. Glasgow?

17         MS. GLASGOW:  My only thought is the agent is from

18   Cedar Rapids, and I know he has a trial next week, and I know

19   there are some other conflicting issues, so that's my only

20   concern about not finishing him at least.

21         THE COURT:  What's the last officer expected to testify

22   about?

23         MS. GLASGOW:  Very similar to what Officer McVey just

24   testified about.  It's almost identical, just confirming his

25   observations.  So that's why I don't think it will take too

1  long.

2          THE COURT:  Okay.  Kelli, are you doing okay?

3          Let's go ahead and put that officer on, then.

4          STEPHEN ALLEN, GOVERNMENT'S WITNESS, SWORN

5          THE DEPUTY CLERK:  Thank you.  Please have a seat.

6          THE COURT:  You can start when you're ready.

7                        DIRECT EXAMINATION

8  BY MS. GLASGOW:

9  Q.  Would you please state and spell your name for the record.

10 A.  My name is Stephen, S-t-e-p-h-e-n, Allen, A-l-l-e-n.

11 Q.  What is your current occupation?

12 A.  I'm a special agent with Homeland Security Investigations.

13 Q.  How long have you been with Homeland Security

14 Investigations?

15 A.  Since March 2020 -- or, sorry, March 2012.  Pardon me.

16 Q.  Do you have prior law enforcement experience?

17 A.  Yes, I do.

18 Q.  What is that?

19 A.  Prior to that I worked for the Department of Defense from

20 September 2009 to March 2012.  Prior to that, I was with the

21 U.S. Secret Service from March 27th, 2000, to September of 2009.

22 Q.  Are you currently assigned to the Iowa Crimes Against

23 Children task force?

24 A.  Yes, I am.

25 Q.  And how long have you been on that task force?

1  A.  I've been on that task force since 2017.

2  Q.  And as part of your assignment to that task force, has your

3  work primarily involved the investigation of child exploitation

4  since that time?

5  A.  Yes.

6  Q.  I want to turn your attention to January 30th, 2020.  Were

7  you involved in an investigation of Justin Treanton related to

8  child exploitation on that date?

9  A.  Yes.

10  Q.  And as a part of the activities of that date, did you have

11  part and did you conduct a briefing of other officers who were

12  going to be involved?

13  A.  Yes, I did.

14  Q.  As a part of that briefing, did you give instructions on

15  what was to take place that day?

16  A.  Yes.

17  Q.  What was that, generally?

18  A.  It was a search warrant for electronics, digital equipment.

19  I also explained that we would be interviewing, if Justin

20  Treanton was there.  There would not be an arrest.  I did show

21  photos of items I wanted to find, being, I believe, like a

22  vibrator, clothing articles.

23         I had brought -- I had taken snapshots from the videos

24  of items I wanted to locate if they -- if it happened there in

25  the residence, so I wanted to locate that, as well as I also

1  took photos of the subject, snapshots of him in the video where

2  you see a beard, and then there's an injury to his hand, I

3  believe it is his right finger.  I cropped down so you can see

4  those markings.  So we were going to also search Justin

5  Treanton, and I wanted to look for those features on his hand as

6  well.

7  Q.  After execution of the search warrant at the residence in

8  the morning, were you involved in attempting to locate

9  Mr. Treanton for execution of the search warrant on his person?

10 A.  Yes.

11 Q.  And did that ultimately lead you to 2917 Belleview Avenue in

12 Bettendorf?

13 A.  Yes.

14 Q.  And did you and other officers have contact with the owner

15 of that residence?

16 A.  Other officers did, yes.

17 Q.  About consent to search the garage for Mr. Treanton?

18 A.  Yes.

19 Q.  Who was all at the location when you arrived?

20 A.  When I arrived, I arrived with Mike McVey, special agent

21 with Iowa DCI.  And then we met with a uniformed deputy, I

22 believe it was a Scott County Deputy.  We came from the front of

23 the home, walked towards the back.  We met with, I believe it

24 was, a relative of the owner.  The owner was January Siem,

25 S-i-e-m, I believe.  He brought us back into the backyard so

1  that we could look into the garage.

2  Q.  And when you arrived at the garage, it's yourself, Special

3  Agent McVey, and a uniformed Scott County Deputy at that door;

4  is that correct?

5  A.  Correct.

6  Q.  Are you in plain clothes on that day?

7  A.  Yes, I am.

8  Q.  Do you have some indication that you are a law enforcement

9  officer?

10  A.  I do have a lanyard with my HSI badge in the middle of my

11  chest, about the middle of my chest, that's displayed.

12  Q.  And when you arrive at the man door, was it your

13  understanding that there were other officers located at the

14  other side of the garage at the overhead door?

15  A.  Yes.

16  Q.  And what happens when you all get to the man door?

17  A.  We knocked to announce police and ended up entering the

18  garage to look.  Once in the garage, the entrance of the garage

19  there, the floor's kind of cleared, but towards the left there's

20  a bed, looks like a curtain or a sheet is hanging, and then from

21  about a middle towards the back of where the cars would enter,

22  the big bay door, there's a lot of debris, trash, things stacked

23  up.

24          And what I could see is a head moving around with --

25  within that garage, that garbage pile, and smoke evanescing

1  upwards, and I was able to call up Justin Treanton to come out

2  towards me.

3  Q.  And so were commands given to Mr. Treanton about to come out

4  to you?

5  A.  Yes.

6  Q.  And did you observe Mr. Treanton coming your direction?

7  A.  He initially came, and then he became hesitant on top of the

8  pile of garbage, like he couldn't come any further, and went

9  back down.

10 Q.  So there came a time when he appeared to no longer be making

11 progress towards you; is that correct?

12 A.  Correct.  Correct.

13 Q.  At some point then the overhead door is opened?

14 A.  Correct.  The overhead door is opened.  Justin is moving on

15 the pile there.  I believe they are directing him to come out.

16 The door's open.  I think he gets -- I didn't -- I don't

17 remember seeing it, but I think he gets pulled out.

18         Once that bay door is open, he's much closer to the bay

19 door than he is to me.  We start heading out the garage to go to

20 the back.

21 Q.  So once you see the bay door open, that's when you start

22 moving, so you're not seeing exactly what's happening there; is

23 that correct?

24 A.  Correct.  And you have a large debris -- debris pile,

25 garbage, that's at least four to five feet high in that garage.

1   Q.  So once you get around to the back side where the bay door

2   is, then what do you see?

3   A.  He -- Justin Treanton is already on the ground.  He is

4   handcuffed.  He's on the -- it is cold that day, so we have a

5   lot of snow and ice compact on the alleyway driveway behind the

6   garage.

7   Q.  Do you see anyone strike Mr. Treanton?

8   A.  No.  Not when I got back there, no.  He was already

9   handcuffed.

10  Q.  Do you hear anyone tell Mr. Treanton he's under arrest?

11  A.  No.  I didn't hear anyone.

12  Q.  What do you do at that point?

13  A.  I -- I kind of pat him down, but I eventually just stand him

14  up.  And Mike at that time -- when I'm standing him up, Mike

15  McVey is in his SUV, he's driving up the alleyway, and he stops.

16  So I walk Justin Treanton to Mike's vehicle and tell him, "Hey,"

17  you know, "you're not under arrest.  I'm here because I want

18  to" -- general, I'm just summarizing, "I'm here because we want

19  to talk to you, okay?  I'm going to take the handcuffs off."

20          I did take the handcuffs off of him.  He -- I asked him

21  to sit in the front seat so that we can talk.

22  Q.  And so where is he when you take the handcuffs off?

23  A.  He is behind Mike McVey's driver's door.  So I'm kind of by

24  the rear driver passenger door is when -- that's where I take

25  the handcuffs off.

ALLEN - DIRECT                                    88

1  Q.  And how does Mr. Treanton get into the vehicle?

2  A.  He walks on his own to get in the vehicle.

3  Q.  And just lets himself in and shuts the door behind him?

4        MR. BELL:  Objection; leading.

5        THE COURT:  Overruled.

6  A.  I think I walked with him to about the front of the vehicle,

7  but he basically got into the car on his own, the SUV.

8  BY MS. GLASGOW:

9  Q.  I'm going to show you what's been marked as Government's

10 Exhibit 6.  Do you see that photograph?

11 A.  Yes.

12 Q.  Do you see a small abrasion to Mr. Treanton's nose?

13 A.  Yes, I do.

14 Q.  Is that consistent with the condition that you observed

15 Mr. Treanton on January 30th?

16 A.  Initially, I did observe some blood on his face from the

17 nose area going down over his mouth.  He did clean that off.

18 But, yes, that's what he looked like on that date after he wiped

19 the blood off his face.

20 Q.  Did you observe any additional injuries on that date?

21 A.  No.

22 Q.  And what amount of blood are we talking about here?

23 A.  You could see blood from the nose over his mustache, over

24 his beard, just maybe like a stream that had come down from the

25 injury.

1  Q.  At some point did Mr. Treanton make a comment about dropping

2  his phone?

3  A.  Yes.

4  Q.  And when did you hear that?

5  A.  I don't recall whether it was before he entered the vehicle

6  or while we were talking to him in the SUV.

7  Q.  Was there anyone other than yourself and Special Agent McVey

8  in the car during the interview?

9  A.  No.

10  Q.  Were there any law enforcement officers surrounding the

11  vehicle during the interview?

12  A.  No.

13  Q.  Were there any firearms or other weapons displayed during

14  the interview?

15  A.  No.

16  Q.  Was there any other force shown during the interview?

17  A.  No.

18  Q.  At some point you have a conversation with Officer McVey

19  outside of the vehicle about a decision to arrest Mr. Treanton;

20  is that correct?

21  A.  Yes.

22  Q.  And have you had time to review the audio portion of the

23  interview and determine approximately when that was?

24  A.  That -- the time when that was, I believe was maybe one hour

25  and 12 minutes or after that time frame that Mike McVey told me

1    that he was going to be arrested.

2    Q.   Prior to that time when you step out of the vehicle and talk

3    to Officer McVey, if Mr. Treanton had asked to leave or said he

4    didn't want to talk anymore, what would have occurred?

5    A.   He could leave.

6    Q.   And he would have just been allowed to get out of the

7    vehicle and go?

8    A.   Yes.  That's normally how we handle these, Mike and I, on

9    these types of cases.  It's voluntary whether he wants to talk

10   to us or not.  He doesn't have to.

11   Q.   I'm going to show you what's been marked as Government's

12   Exhibit 4.  Did you observe Mr. Treanton execute that document?

13   A.   Yes.  While in the vehicle.

14            MS. GLASGOW:  I have no further questions for this

15   witness, Your Honor.

16            THE COURT:  Mr. Bell.

17            MR. BELL:  Thank you, Your Honor.

18                           CROSS-EXAMINATION

19   BY MR. BELL:

20   Q.   My name's Murray Bell.  I have some questions.  I'm sure

21   that doesn't surprise you.

22   A.   Go ahead, Mr. Bell.

23   Q.   Thank you.

24            So did you attend the briefing they had first thing in

25   the morning before they went and executed the search warrant at

1   the residence where they thought he would be?

2   A.   Yes.  I was the one who conducted the briefing with Mike

3   McVey.

4   Q.   Okay.  Do you know if Detective Carter was there during that

5   briefing?

6   A.   No.  That briefing was -- I believe it was Iowa DCI, myself.

7   There were state troopers there, and it -- I believe there were

8   two Bettendorf detectives who were going to be at the school

9   grounds behind the residence.

10  Q.   Were there no Scott County Sheriff agent -- personnel?

11  A.   I don't remember that.  I do -- I did document who was in

12  that briefing, which is on a report that was submitted for the

13  case.

14          Oh, for Scott County, I'm -- Scott Grafton would be the

15  only one I can think of right now.  He's the sex offender

16  coordinator, I believe, for the sheriff's office.

17  Q.   Okay.

18  A.   So that would be a Scott County official I could remember.

19  Q.   Now, you've been sitting out there in the lobby waiting your

20  turn to talk, right?

21  A.   Yes.

22  Q.   And do you recognize any of the officers out there to have

23  been at the briefing?

24  A.   No.  I didn't recognize the officers.  It's -- whether they

25  were at the briefing or not.  It's been over a year.  I don't

1  work with these officers on a regular basis.  I work with Mike

2  McVey on a regular basis.

3  Q.  Okay.  So you believed -- your earlier testimony was that

4  you had seen a video, and you believe that Mr. -- I can't think

5  of his name.

6  A.  Treanton.

7  Q.  Treanton.  Thanks.  I'm supposed to know that.

8          -- Mr. Treanton's face was recognizable?

9  A.  Oh, I didn't say it was recognize -- I can clarify and say

10 it was not recognizable.  There were features from that video

11 that were observed.  I showed those images to his stepfather,

12 and he believed it was Justin.

13 Q.  And that was before they found Justin at the garage where he

14 was --

15 A.  Correct.

16 Q.  -- questioned, I'll say?

17 A.  Right.  Right.  So -- yes.  Robert Wickham is the

18 stepfather.

19 Q.  Right.  He was in the residence that was searched early in

20 the morning, 7:00-ish?

21 A.  Yes.

22 Q.  And so at that time in the morning, you asked him about the

23 picture.  He said, "I think that is Justin," correct?

24 A.  Summarizing, yes.

25 Q.  And the video that that picture came from was a video of

1    what might have been his 4-year-old performing a sex act on him?

2    A.   A 4-year-old performing a sex act on Justin Treanton?

3    Q.   Oral sex?

4    A.   I don't believe the video has oral sex on it.

5    Q.   What do you think it has?

6    A.   I -- I have not played the videos since last year, but if

7    you allow me, I will review the three videos.  I don't recall

8    that.  I didn't know we were discussing the videos.

9            THE COURT:  Mr. Bell, all of this is beyond the scope

10   of direct.  Can you get to what's relevant here?

11           MR. BELL:  I'm trying to get to whether or not they

12   believed he committed a crime by the time they questioned him.

13   BY MR. BELL:

14   Q.   Did you believe he had committed a crime by the time you

15   questioned him?

16   A.   No.  By the time I questioned him, did I believe he

17   committed a crime?  Let me correct that.  Let me add some

18   additional information.

19           The child, the 4-year-old, had been interviewed after

20   the search warrant by the child protection center.

21   Q.   Prior to the time that you interviewed Mr. Treanton?

22   A.   Yes.

23   Q.   And did they tell you what she said?

24   A.   Yes.

25   Q.   And did they tell you that it appeared to them that she

1  committed -- that there was a sex act between her and her dad?

2  A.  I don't remember what they told me, that a sex -- phrased

3  that way, but something had happened, yes.

4  Q.  Okay.

5  A.  An offense had happened, yes.

6  Q.  So you believed at the time that an offense had taken place?

7  A.  According to the -- something had happened, yes.

8  Q.  Well, earlier you said "an offense."  Now are you changing

9  that?

10  A.  I'm saying yes, something had happened.

11  Q.  I understand.  But I think --

12  A.  An offense, yes.

13  Q.  Okay.  So you had probable cause to arrest?

14  A.  Yes.

15  Q.  Okay.  Now, you didn't take the handcuffs off of him as soon

16  as you stood him up off the ground, is that -- or he was stood

17  up.  You didn't assist in standing him up?

18  A.  I did.

19  Q.  Okay.  You didn't take the handcuffs off immediately.  You

20  walked him across the alley to the car; is that correct?

21  A.  Mike pulled up next to the garage, basically, in the alley.

22  We weren't that far away.  I walked him there because it is ice

23  and snow, and by having the vehicle there, it's just easier to

24  have something in case someone slips.  There was ice on the

25  ground.

1  Q.  Okay.  Now, the question was you didn't take the handcuffs

2  off till he got to the vehicle, correct?

3  A.  I walked him to the vehicle, correct.

4  Q.  With the --

5  A.  I didn't take the handcuffs off until I got close to the

6  vehicle.

7  Q.  Okay.

8         MR. BELL:  Can I have a second with my client?

9         THE COURT:  Yes.

10 BY MR. BELL:

11 Q.  As the interview took place, were there other officers in

12 the alleyway?

13 A.  Yes.

14 Q.  How many?

15 A.  There were at least three initially, and there may have been

16 additional that came in or left.

17 Q.  So there were officers around the entire time he was in the

18 car -- Mr. Treanton was in the vehicle?

19 A.  The officers were on one side.  They were at the garage.  So

20 the front, behind the vehicle, to the right of the vehicle where

21 he was sitting -- there were no officers on the right-hand side

22 where he was sitting in the front passenger seat, nor behind,

23 and I was sitting on the driver's side passenger.  I was not

24 directly behind Mr. Treanton.

25 Q.  But there were two officers in the car?

ALLEN - REDIRECT                    96

1   A.  Yes.

2   Q.  And there were several -- three, four, five -- officers in

3   the alleyway?

4   A.  There were at least three that I remember, and then there

5   were a couple others that maybe came and left, yes.

6   Q.  Okay.  Thank you.

7        MR. BELL:  I don't think I have any other questions,

8   Your Honor.  Thank you.

9        THE COURT:  Ms. Glasgow.

10                      REDIRECT EXAMINATION

11  BY MS. GLASGOW:

12  Q.  Special Agent, how long, approximately, did it take you to

13  walk from the man door to the back door, would you say?

14  A.  The man door to the back door?

15  Q.  To the overhead garage door.

16  A.  Oh, short amount of time.  Basically, I just left and went

17  straight to the back of the -- the bay door.

18  Q.  And from the time that you get around to the bay door till

19  you take off Mr. Treanton's handcuffs, approximately how long do

20  you think that was?

21  A.  About a minute.

22        MS. GLASGOW:  I have no further questions, Your Honor.

23        THE COURT:  Mr. Bell?

24        MR. BELL:  Nothing further, Your Honor.

25        THE COURT:  Thank you, Special Agent.  You're excused.

1                            (Witness excused.)

2           THE COURT:  Mr. Bell, would you like to present any

3    evidence?

4           MR. BELL:  I'd like a minute with my client to talk

5    about that.

6           THE COURT:  Go ahead.

7           (Mr. Bell conferred with Mr. Treanton.)

8           MR. BELL:  Your Honor, I assume -- I believe we have no

9    further evidence to offer.

10          THE COURT:  Okay.  Then I will take the matter under

11   advisement, and we are adjourned.

12          MR. BELL:  Could I just ask the Court to advise

13   Mr. Treanton that he has a right to testify?

14          THE COURT:  Oh, sure.

15          Mr. Treanton, you have a right to testify, if you would

16   like to, in this hearing.  If you do so, you potentially open

17   yourself up to questions that may provide additional inculpatory

18   information to the United States; in other words, you may give

19   them more evidence against you than they currently have.

20          You also run the risk, if you provide testimony that

21   the United States believes is false, of additional charges, or

22   if I believed it was false, of additional charges, or, if

23   convicted of this offense, of additional sentencing

24   enhancements.  Now, I don't have any reason to believe you'd

25   testify falsely, but I have to warn anybody that might testify

1    about that potential.

2          So you do have a right to testify.  It's my

3    understanding you're not going to be testifying.  Is that

4    correct?

5          THE DEFENDANT:  That is correct.

6          THE COURT:  Okay.  We're adjourned.

7          MR. BELL:  Thank you very much, Your Honor.

8          (Proceedings concluded at 5:16 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2              I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3  the State of Iowa and Federal Official Realtime Court Reporter

4  in and for the United States District Court for the Southern

5  District of Iowa, do hereby certify, pursuant to Title 28,

6  United States Code, Section 753, that the foregoing is a true

7  and correct transcript of the stenographically reported

8  proceedings held in the above-entitled matter and that the

9  transcript page format is in conformance with the regulations of

10  the Judicial Conference of the United States.

11             Dated at Des Moines, Iowa, this 28th day of March,

12  2022.

13

14                      _Kelli M. Mulcahy_
                         Kelli M. Mulcahy, CSR, RDR, CRR
15                       Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25